# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

ADAM X., BRIAN Y., CASEY Z., on behalf of
themselves and all others similarly situated, and
the AMERICAN CIVIL LIBERTIES UNION
OF NEW JERSEY;

                    Plaintiffs,

    v.

NEW JERSEY DEPARTMENT OF
CORRECTIONS, GARY LANIGAN, in his
official capacity as Commissioner of the New
Jersey Department of Corrections, NEW
JERSEY DEPARTMENT OF EDUCATION,
and KIMBERLY HARRINGTON, in her
official capacity as Acting Commissioner of the
New Jersey Department of Education,

               Defendants.
_____

**CLASS ACTION COMPLAINT**

Hon._____

Civil Action No._____

Edward L. Barocas
Jeanne LoCicero
Rebecca Livengood
AMERICAN CIVIL LIBERTIES UNION OF
NEW JERSEY FOUNDATION
89 Market Street, 7th floor
PO Box 32159
Newark, New Jersey  07102
(973) 854-1733

Brian L. Friedman*
William C. Silverman*
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
(212) 969-3000

*Motions to appear *Pro Hac Vice* to be filed

*Attorneys for Plaintiffs*

Mary-Lee K. Smith*
Seth Packrone*
DISABILITY RIGHTS ADVOCATES
675 Third Avenue, Suite 2216
New York, NY 10017
(212) 644-8644

Plaintiff Adam X. is a resident of Union County, New Jersey, and is currently incarcerated by Defendant New Jersey Department of Corrections ("NJDOC"). Plaintiff Brian Y. is a resident of Essex County, New Jersey, and is currently incarcerated by Defendant NJDOC. Plaintiff Casey Z. is a resident of Essex County, New Jersey, and is currently incarcerated by Defendant NJDOC. All Plaintiffs may be contacted through their counsel, whose addresses are noted in this Complaint. Defendant NJDOC and Defendant Gary Lanigan have the address of Whittlesey Road, P.O. Box 863, Trenton, NJ 08625. Defendant New Jersey Department of Education ("NJDOE") and Defendant Kimberly Harrington have the address of 100 River View Plaza, P.O. Box 500, Trenton, NJ 08625.

Plaintiffs Adam X., Brian Y., and Casey Z.,[1] individually and on behalf of all others similarly situated, and the American Civil Liberties Union of New Jersey ("ACLU-NJ") (collectively, "Plaintiffs"), by and through their counsel, American Civil Liberties Union of New Jersey Foundation, Disability Rights Advocates, and Proskauer Rose LLP, bring this Complaint against NJDOC and Gary Lanigan, in his official capacity as Commissioner of the New Jersey Department of Corrections (collectively "NJDOC Defendants"), and NJDOE and Kimberly Harrington, in her official capacity as Acting Commissioner of the New Jersey Department of Education (collectively "NJDOE Defendants").

## INTRODUCTION

1.      This civil rights lawsuit challenges Defendants' systemic failure to provide appropriate and equal education to high school students with disabilities who are incarcerated in adult prisons owned, operated, and/or controlled by NJDOC Defendants.

---

[1] Plaintiffs have filed a concurrent motion to proceed under pseudonym. As discussed in the brief supporting that motion, this case involves sensitive medical and educational information about the named plaintiffs and there is no particular public interest in the Plaintiffs' identities, all factors that weigh heavily in favor of anonymity.

2.      The law is clear:  Students with disabilities age twenty-one and younger[2] are entitled to special education and related services and to equal educational access though incarcerated in adult prisons. Defendants are obligated to provide and monitor the provision of this education.

3.      Under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); and the New Jersey Civil Rights Act N.J.S.A. 10:6-1 *et seq.* ("NJCRA"), students with disabilities age twenty-one and younger who are held in adult correctional facilities are entitled to receive a free appropriate public education ("FAPE"), which includes special education and related services.

4.      Defendants' legal obligations to students with disabilities do not stop with FAPE. In addition to IDEA and Section 504's FAPE requirements, students with disabilities are entitled to equal access[3] to education under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), Section 504, and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-1, *et seq*. Under these legal mandates, students with disabilities cannot be denied the benefits of, or excluded from, participation in Defendants' educational services.

---

[2] Under New Jersey state law, students incarcerated in adult facilities are entitled to special education and related services until "the attainment of the 21st birthday by June 30 of that school year. Students with disabilities attaining age 21 during the school year shall continue to be provided services for the balance of that school year." N.J.A.C. 6A:14-1.3.

[3] Equal access refers to the access guaranteed under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), as described in 28 C.F.R. § 35.130(b)(1) and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-1. Such access can be achieved through, among other things, reasonable modifications to policies, practices, and procedures; changes in methods of administration; revisions to eligibility criteria; and ensuring services are offered in the most integrated setting.

5.    Despite their legal obligations, NJDOC Defendants systemically fail throughout NJDOC's thirteen adult prisons to provide special education or related services and equal educational access for students with disabilities. As a result, these students are denied a free appropriate public education. NJDOC Defendants also fail to provide students with disabilities, because of their disabilities, the opportunity to equally and effectively participate in and benefit from the educational services and programs offered and overseen by NJDOC Defendants in NJDOC facilities.

6.    NJDOC Defendants' failures are particularly egregious in the context of administrative segregation.[4] When NJDOC Defendants lock young people in administrative segregation, they deny them special education services as required by IDEA and Section 504 and equal access to education as required by the ADA and Section 504. Instead of receiving education in a classroom, young people in administrative segregation, if they receive any education at all, are provided with worksheets either in their cells or in a cage while an instructor watches from outside.

7.    NJDOC Defendants' administrative segregation policies and practices have a disproportionate burden on the named plaintiffs and the class they represent, as young people are routinely sent to administrative segregation regardless of their disabilities—ignoring disability-related behavior and the disability-specific consequences of such segregation. It is widely

---

[4] The term "administrative segregation" refers to a practice commonly described as "solitary confinement." Inmates in administrative segregation are only provided with five hours of recreation a week, *see* N.J.A.C. 10A:5-3.13, and three opportunities a week to shave and shower. *See* N.J.A.C. 10A:5-3.6. The NJDOC regulations do not provide for regular face-to-face contact, unobstructed by cells, with medical professionals or other NJDOC staff outside of the aforementioned provisions. Effectively, individuals are deprived of equal human contact for the vast majority of their time while held in administrative segregation, leading to serious mental health risks. Plaintiffs use "lock-up" to refer to conditions similar to administrative segregation in facilities that do not have a designated administrative segregation unit and/or that may use practices identical to administrative segregation for periods of less than two weeks.

accepted that administrative segregation exacerbates the kinds of disabilities Plaintiffs have.[5] Administrative segregation also results in students falling further behind in their education. Defendants have no procedures for bringing students up to speed on their schoolwork after they are released from administrative segregation, making it difficult for them to benefit from their education and attain high school diplomas. In fact, falling behind in schoolwork and thus, high school credits, wastes valuable time since students with disabilities are only entitled to special education and related services through the school year of their twenty-first birthday.

8.    NJDOE Defendants are complicit in this discrimination, neglecting their obligations to provide guidance regarding, to administer federal funding for, and to monitor and ensure the provision of special education and related services in compliance with applicable federal and state law.

9.    As described herein, the named plaintiffs entered NJDOC custody as teenagers, some with histories of receiving IDEA special education services and some qualifying for protection under the ADA and Section 504. NJDOC Defendants have failed to provide, and NJDOE Defendants have failed to ensure the named plaintiffs receive, services and education as required by these statutes.

10.    By failing to provide appropriate special education and related services, and equal access to education, Defendants deny Plaintiffs and ACLU-NJ members their rights in violation of IDEA, ADA, Section 504, NJCRA, and NJLAD. These violations of detained students' civil

---

[5] Experts agree that locking young people with mental disabilities (such as ADHD, mood/personality disorders, and cognitive impairments) in administrative segregation worsens symptoms of their disabilities and does not serve as a deterrent for disability-related behavior. In addition to the direct harm administrative segregation causes, these effects also make placement in administrative segregation in the future more likely. *See, e.g.*, Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J. L. & POL'Y 325 (2006); Craig Haney, *Mental Health issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQUENCY 124 (January 2003).

rights and illegal deprivations of educational services at NJDOC facilities are rampant and widespread, yet Defendants have allowed these violations to persist.

11.     Plaintiffs seek declaratory and injunctive relief on behalf of themselves and a class of similarly situated students ("Plaintiff Class") in the form of an order finding Defendants out of compliance with relevant laws and directing Defendants to comply with all relevant laws by providing a free appropriate public education and equal access to education for all students with disabilities in the custody of NJDOC. Such compliance requires Defendants to (1) abide by the substantive and procedural requirements of IDEA and Section 504 which include, *inter alia*, identifying and evaluating all students with disabilities under eighteen years of age in NJDOC custody, developing and implementing individual education programs ("IEPs") for eligible students, ensuring procedural protections for students with disabilities who face disciplinary measures, and providing FAPE regardless of discipline (including when students with disabilities are in administrative segregation); and (2) follow the non-discriminatory mandates of the ADA and Section 504 which include ensuring equal access to education and ensuring that students with disabilities are not disproportionately burdened by administrative segregation through, *inter alia*, making reasonable modifications, changing methods of administration, revising eligibility criteria, and providing an integrated setting. Plaintiffs also seek an award of reasonable attorneys' fees and costs under applicable law and request any other relief the Court deems appropriate.

12.     Plaintiffs have suffered and continue to suffer irreparable harm as a result of Defendants' ongoing refusal to meet the needs of students with disabilities in NJDOC facilities, and will continue to suffer further irreparable harm unless and until the Court grants declaratory and injunctive relief against Defendants to remedy the ongoing illegal treatment of and

discrimination against students with disabilities at NJDOC facilities, and to ensure that the rights of students with disabilities are not violated.

## JURISDICTION AND VENUE

13.    Plaintiffs bring claims under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 *et seq.*; and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.*

14.    This Court has jurisdiction over the action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4) as this is a civil action arising under the laws of the United States. This Court has jurisdiction over the supplemental claims arising under New Jersey state law pursuant to 28 U.S.C. § 1367(a).

15.    Venue is proper for the United States District Court for the District of New Jersey pursuant to 28 U.S.C § 1391 (a), (b), and (c) because the claims arose in this district and the parties reside in this district.

## PARTIES

16.    Plaintiff Adam X. is a nineteen-year-old citizen of the United States, currently incarcerated at Garden State Youth Correctional Facility ("Garden State").

17.    Adam X. has been detained in NJDOC facilities since August of 2015, when he was eighteen.

18.    Adam X. has been diagnosed under an IDEA disability category that his IEP describes as "emotionally disturbed." Adam X. also has been diagnosed with attention deficit hyperactivity disorder ("ADHD"). These impairments substantially limit one or more of his major life activities, making him an individual with a disability. He is currently incarcerated at

Garden State and so NJDOC Defendants are responsible for providing educational services to him.

19.    Plaintiff Brian Y. is a nineteen-year-old citizen of the United States, currently incarcerated at Garden State.

20.    Brian Y. has been detained in NJDOC facilities since August of 2013, when he was under the age of eighteen.

21.    Brian Y. has been diagnosed with oppositional defiant disorder, impulse control disorder, ADHD, and adjustment disorder. These impairments substantially limit one or more of his major life activities, making him an individual with a disability. He is currently incarcerated at Garden State and so NJDOC Defendants are responsible for providing educational services to him.

22.    Plaintiff Casey Z. is a twenty-one-year-old citizen of the United States, currently incarcerated at New Jersey State Prison ("NJSP").

23.    Casey Z. has been detained in NJDOC facilities since July of 2015, when he was nineteen.

24.    Casey Z. has been diagnosed with a specific learning disability, ADHD, an adjustment disorder, a conduct disorder, and has a history of exposure to lead at elevated levels. These impairments substantially limit one or more of his major life activities, making him an individual with a disability. He is currently incarcerated at NJSP and so NJDOC Defendants are responsible for providing educational services to him.

25.    Organizational plaintiff American Civil Liberties Union of New Jersey is a private, non-profit, non-partisan membership organization dedicated to the principle of individual liberty embodied in the Constitution. Founded in 1960, the ACLU-NJ has

approximately 14,000 members and donors in New Jersey and tens of thousands of supporters across the state. Its office is located in Newark, New Jersey. The ACLU-NJ is the state affiliate of the American Civil Liberties Union, which was founded in 1920 for identical purposes, and is composed of hundreds of thousands of members and supporters nationwide. Among the organizational interests of the ACLU-NJ is ensuring access to education for all New Jerseyans, including incarcerated young people.

26.    The ACLU-NJ suffered injury to the organization by expending significant resources due to Defendants' actions and inactions. By failing to follow or comply with federal and state education laws, Defendants have forced ACLU-NJ to advocate for the rights of incarcerated individuals who are being denied education. Also, by failing to account for disability in its policies and procedures, NJDOC Defendants have forced ACLU-NJ to engage in policy advocacy to eliminate solitary confinement for the most vulnerable populations, including young people with disabilities. The ACLU-NJ also has members who have suffered injury due to Defendants' actions and inactions. These members are incarcerated young people in adult prisons who are denied special education and equal access to education and who have been locked in administrative segregation regardless of their disabilities. Members also include parents of young people with disabilities who can pursue, on behalf of their children, claims for denial of special education and equal access to education.

27.    Defendant New Jersey Department of Corrections is a New Jersey state agency located in Trenton, New Jersey. NJDOC contains the Office of Educational Services ("OES"), a subdivision of NJDOC's Division of Programs and Community Services, which is responsible for providing special education services to all eligible students age twenty-one and younger in NJDOC custody.

28.    Defendant Gary Lanigan is Commissioner of NJDOC and is sued in his official capacity.

29.    Defendant New Jersey Department of Education is a New Jersey state agency located in Trenton, New Jersey. NJDOE contains the Office of Special Education Programs ("OSEP"), which is responsible for overseeing the provision of special education in New Jersey.

30.    Defendant Kimberley Harrington is the Acting Commissioner of NJDOE and is sued in her official capacity.

## CLASS ALLEGATIONS

31.    Plaintiffs bring this action individually and on behalf of all persons similarly situated pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

32.    The class consists of all people, age twenty-one and younger, with mental disabilities who are currently detained or who will be detained at NJDOC facilities, where "mental disabilities" is defined to include all those mental disabilities enumerated under IDEA and any mental impairment that substantially limits a major life activity consistent with the ADA and Section 504 of the Rehabilitation Act ("Plaintiff Class").

33.    The persons in the class are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit to the parties and to the Court. Indeed, Plaintiffs maintain that the class of persons consists of hundreds of youth. According to publicly available information on NJDOC's website, there are approximately 798 young people age twenty-one and younger in NJDOC facilities. In the 2015-2016 school year, approximately 96 students (about 12% of students age twenty-one and younger) in NJDOC custody were considered eligible for special education. This number is likely a gross undercount. Estimates of the percentage of youth in detention facilities who require either an IEP or a Section

504 Plan can be as high as 70%. The Juvenile Justice Commission ("JJC"), the other agency in New Jersey charged with providing education to incarcerated young people, serves a population similar in age to the putative class (60% of people in JJC custody are eighteen or over). The JJC reports that approximately 42% of students in its custody have been diagnosed as having special education needs. Extrapolating from that percentage, approximately 335 students age twenty-one and younger in NJDOC facilities likely have been or should have been diagnosed as having special education needs before entering NJDOC custody. Plaintiffs maintain that many detained youth who have a disability have not been identified as such because of Defendants' failure to fulfill their obligations under federal and state laws to obtain students' records in a timely manner; to locate, identify, and assess youth suspected of having a disability; and to provide services to those students who already had an IEP when they entered NJDOC custody.

34.     Moreover, this is a fluid class because the population within NJDOC facilities changes frequently and not all class members can be specifically identified.

35.     There are questions of law and fact common to the class. All individuals are subject to the same conditions, the legality of which will be determined under IDEA, the ADA, Section 504, NJCRA, and NJLAD.

36.     The claims of the Plaintiffs are typical of the claims of the class. Plaintiffs have been and are being denied their legal right to a free appropriate public education and to equal educational access.

37.     Plaintiffs will fairly and adequately protect the interests of the class. There are no conflicts between the Plaintiffs and other class members. Plaintiffs have retained counsel experienced in class action litigation relating to education, special education, and the civil rights of persons with disabilities.

38.     Defendants have acted and/or failed to act on grounds generally applicable to the class as a whole, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

39.     Plaintiffs cannot exhaust their educational due process administrative remedies, pursuant to IDEA, because it is both futile and impossible to do so. Exhaustion through individual due process claims in the Office of Administrative Law is impossible because the harms that the individual plaintiffs allege and the remedies they seek are systemic. Systemic deficiencies are not capable of review in a particular student's due process claim, nor is systemic relief available as a remedy in such a case. Thus, an effort to exhaust for the individual plaintiffs would be futile. Additionally, it is impossible for ACLU-NJ to exhaust its claims for the organizational harms it has suffered through the Office of Administrative Law.

## FACTUAL ALLEGATIONS

### *State of New Jersey Department of Corrections*

40.     Defendant NJDOC operates thirteen adult correctional facilities throughout the state of New Jersey.

41.     According to its website, NJDOC describes ten facilities, collectively, as the Prison Complex:  NJSP, Central Reception and Assignment Facility ("CRAF"), East Jersey State Prison, Bayside State Prison, Mid-State Correctional Facility (temporarily closed for renovation), Southern State Correctional Facility, Northern State Prison ("Northern State"), South Woods State Prison, Edna Mahan Correctional Facility for Women, and the Adult Diagnostic and Treatment Center (a facility for adult male sex offenders).

42.     As of January 4, 2016, 14,396 people resided in Prison Complex facilities.

43.     NJDOC describes three facilities as the Youth Correctional Complex:  Garden State, Albert C. Wagner Youth Correctional Facility ("Wagner"), and Mountainview Youth

Correctional Facility ("Mountainview").

44.    As of January 4, 2016, 2,973 people resided in the Youth Correctional Complex facilities.

45.    Currently, people age twenty-one and younger reside in all facilities, except Bayside State Prison, but because housing decisions are based on NJDOC's institutional and security interests, and prisoners have no right to a particular housing assignment, students age twenty-one and younger can be moved to any NJDOC prison while serving their sentences, and so compliance with special education laws is required on a system-wide basis.

### Educational Policies and Practices at
### New Jersey Department of Corrections Facilities

46.    The Office of Educational Services, an NJDOC subdivision of the Division of Programs & Community Services, is charged with carrying out NJDOC's responsibility to provide educational services. According to NJDOC's website, OES's mission "is to provide student inmates with academic, vocational and life-skills programming. … Staff members supervise, support and ensure delivery of educational services, including law library services." Additionally, the OES section of NJDOC's website states that OES must "ensur[e] that all available funding is allocated, distributed and utilized," including funds collected from Direct State Appropriations, State Facilities Education Act ("SFEA"), Title I Neglected and Delinquent, and the Individuals with Disabilities Education Act Part B.

47.    NJDOC, through OES, operates the High School Diploma Program. As part of the High School Diploma Program, according to the OES section of NJDOC's website, "[a]ll youth offenders under the age of twenty, as well as those under age twenty-one with an Individualized Education Plan (IEP), are provided traditional high school coursework, including mathematics, social studies, language arts, science and enrichment classes. Students earn credits from their

home school districts toward fulfillment of their high school diplomas. Youth students are mandated to complete such coursework until they reach an ineligible age."

48.    NJDOC administers the Test of Adult Basic Education ("TABE") to students entering its facilities. After NJDOC places the students in classes based on their TABE scores, they are tested again after sixty hours of instruction to measure any educational gains.

### Special Education and Equal Educational Access Requirements for Youth with Disabilities at New Jersey Department of Corrections Facilities

49.    Together, IDEA, Section 504, and NJCRA require NJDOC Defendants to provide students with disabilities age twenty-one and younger with a free appropriate public education.

50.    As part of their obligation to provide FAPE, NJDOC Defendants must, among other things:  (1) identify, locate, and evaluate all students with disabilities in their custody who are under eighteen years old per the "Child Find" requirement under IDEA and Section 504; (2) develop and implement appropriate IEPs for students with disabilities; (3) provide "comparable services" to all students who enter their custody already eligible for special education; (4) offer a "continuum of alternative placements" to meet the needs of students with disabilities; (5) provide education in the least restrictive environment appropriate; (6) provide procedural protections, including "manifestation determinations," for students with disabilities who face disciplinary measures – including placement in administrative segregation – to ensure that they are not being disciplined for behavior that is a manifestation of their disability; (7) provide "transition services" for plans following graduation; and (8) continue to provide FAPE when students with disabilities face a "change in placement," including being placed in administrative segregation.

51.    In addition to their obligation to provide FAPE to all eligible students with disabilities, the ADA and Section 504 require NJDOC Defendants to provide all eligible students with disabilities equal access to education by, *inter alia*: (1) making reasonable modifications in

their policies, practices, and procedures; (2) changing methods of administration; (3) revising eligibility criteria; and (4) providing an integrated setting. These remedial steps would require NJDOC Defendants, at a minimum, to identify and track students with disabilities, to inquire into whether behaviors leading to discipline are disability-related, and to ensure that students with disabilities are not disproportionately burdened by administrative segregation.

52.     New Jersey education regulations additionally require that NJDOC Defendants provide all students who are not eligible for special education services (*i.e.* general education students) with an individualized program plan ("IPP")[6] within 30 calendar days of their placement in NJDOC's custody.

**Systemic Failure of New Jersey Department of Corrections to Comply with the Law**

53.     NJDOC Defendants systemically fail to fulfill their legal obligations under federal and state laws from the time young people with disabilities enter their custody. Indeed, NJDOC's spending plan under the State Facilities Education Act allocated no money to education at Wagner, Northern State, or NJSP. The individual plaintiffs, who all have special educational needs, have resided or currently reside at all three of these facilities.

<u>Failure to Comply with IDEA, Section 504, and NJCRA</u>

54.     Defendants systemically fail in their Child Find duties pursuant to IDEA and Section 504. Child Find requires NJDOC Defendants to locate, identify, and evaluate individuals with disabilities regardless of whether previous school records indicate a need for special education or reasonable modifications. NJDOC Defendants do not take these required steps, and only provide special education services to students who are already identified as having a disability when they enter NJDOC custody.

---

[6] An IPP is not the same as an IEP. An IPP is for general education students and an IEP is for special education students and required under IDEA.

55.    For students who were already identified as eligible for special education services when they entered custody, NJDOC Defendants systemically fail to provide the individualized educational services that these students are entitled to under the law.

56.    NJDOC Defendants routinely place students of different ages and ability levels in a single classroom with only one teacher, disregarding the requirements laid out in students' IEPs. As a result, teachers provide direct instruction sporadically and fail to differentiate instruction to meet each student's individual needs. Teachers are rarely certified to teach special education or qualified to teach the variety of subjects they are teaching. Much of students' work in NJDOC classrooms consists of independently completing worksheets.

57.    NJDOC Defendants fail in a number of different ways to develop and implement appropriate IEPs for students with disabilities. NJDOC Defendants do not provide specialized academic instruction to students with disabilities for the required amount of time called for in those students' IEPs. Indeed, when students with disabilities have difficulty on their worksheets, NJDOC teachers routinely encourage them to ask other inmates for help rather than provide the special education and related services laid out in students' IEPs.

58.    Students with disabilities who come from special day classes or non-public schools that provide full-time special education instruction and related services typically received 300 minutes of specialized academic instruction in those settings. When these students enter NJDOC custody, Defendants greatly reduce the amount of specialized instruction without explanation.

59.    NJDOC Defendants fail to provide transition services to young people with IEPs who will leave NJDOC custody before the June following their twenty-first year. These transition services are intended to assist young people in developing a plan for their post-

secondary education or vocation.

60.    NJDOC Defendants also fail to provide the continuum of alternative placements required under the law. A continuum of alternative placements means that NJDOC Defendants must provide a range of educational environments that offer varying degrees and forms of special education (*e.g.*, in-class one-on-one tutoring, full-time special education class). In some facilities, such as NJSP, there have been long periods where the only classroom was a GED classroom. In other facilities, such as Garden State, though NJDOC Defendants may provide what they describes as special education classes, those classes do not in fact provide special education, for the reasons described herein.

61.    NJDOC Defendants also fail to provide education to students in the least restrictive environment appropriate. The least restrictive environment requirement ensures that young people with disabilities will not be segregated in their education, unless appropriate for the provision of special educational services.

62.    Because of the lack of placements at NJDOC, students coming from a non-general education setting cannot possibly receive comparable services, because putting such a student in a general education setting after he or she was, for instance, previously placed in a non-public school with full-time special education instruction is not "comparable." Under the comparable services requirement, NJDOC Defendants must provide equivalent educational services to what educational services students had prior to entering a new educational placement. In addition, NJDOC Defendants fail to provide comparable services to students with disabilities before an IEP is developed and implemented, as is also legally required.

63.    When students with disabilities face disciplinary measures, NJDOC Defendants fail to provide the protections required under IDEA. NJDOC Defendants do not conduct

manifestation determinations for students with disabilities before changing their educational placements, including by moving them to placement in administrative segregation, nor do NJDOC Defendants rely on positive behavioral interventions and supports to counter behavior that impedes learning.

64.     Once students with disabilities are placed in administrative segregation, NJDOC Defendants fail to provide them with the required special education and related services.

65.     Frequently, students with disabilities in administrative segregation are provided with no educational services whatsoever, let alone special education and related services.

66.     Any education that NJDOC Defendants provide and allow for students with disabilities in administrative segregation does not constitute special education, as it does not follow the students' IEP goals and does not allow students with disabilities to continue to participate in the general education curriculum.

67.     Education in administrative segregation frequently consists of worksheets dropped off at the student's cell, with no direct instruction at all. For young people with disabilities, who struggle to read and grasp new concepts, this educational method of providing worksheets without instruction results in frustration rather than meaningful education. Other students leave their cell to attend classes in a structure enclosed on all sides by bars, essentially a cage. The students sit in the center of the cage, while a teacher stands outside of the cage and monitors the students while they complete their worksheets.

<u>Failure to Comply with ADA, Section 504, and NJLAD</u>

68.     NJDOC Defendants not only fail to meet the FAPE standards, but also fail to provide equal access to education under Title II of the ADA, Section 504, and NJLAD, which require educational services that provide an equal and effective opportunity for young people

with disabilities to access education.

69.    The equal access to education requirement under the ADA and Section 504 holds NJDOC Defendants to a higher standard than that of FAPE. For instance, the FAPE standard requires that Child Find obligations continue only until age eighteen, while the equal access standard would require NJDOC Defendants to identify, track, and accommodate disabled students as needed to provide equal access to education past the age of eighteen. Likewise, the ADA and Section 504 mandate that NJDOC Defendants inquire into whether behaviors leading to discipline are disability-related. These requirements are independent of IDEA's manifestation determination requirement. For example, even if a manifestation determination has occurred, or is not required, the ADA and Section 504 nevertheless require NJDOC Defendants to analyze behavior before disciplining a young person with a disability to determine if the behavior is disability-related.

70.    The ADA, Section 504, and NJLAD also require that young people with disabilities who are incarcerated not be disproportionately burdened by conditions of confinement. For instance, as has been widely recognized, conditions in administrative segregation exacerbate young people's disabilities, causing them to fall further behind in education. To make matters worse, NJDOC Defendants' lack of procedures to bring these students back up to speed after they leave administrative segregation makes it more difficult for the students to benefit from educational services. As such, given NJDOC Defendants' policies and practices, students placed in administrative segregation are denied equal access to education.

### *State of New Jersey Department of Education's Oversight Responsibilities*

71.    Under IDEA, each "[s]tate educational agency is responsible for ensuring that … the requirements of [a free appropriate public education in the least restrictive environment] are

met [and that] all educational programs for children with disabilities in the State … meet the educational standards of the State educational agency." 20 U.S.C. § 1412(a)(11)(A); *accord* 34 C.F.R. § 300.101(c)(1) ("Each State must ensure that FAPE is available to any individual child with a disability who needs special education and related services …"); 34 C.F.R. § 300.114(a)(1) ("[T]he State must have in effect policies and procedures to ensure that public agencies in the State meet the LRE requirements of this section …"); *see also* 34 C.F.R. § 300.149(a)(2)(ii).

72.     NJDOE is New Jersey's state educational agency ("SEA") because it is the state "agency … primarily responsible for State supervision of public elementary schools and secondary schools." 20 U.S.C. § 1401(32); 34 C.F.R. § 300.41; *see also, e.g.*, N.J.A.C. 6A:14-9.1.

73.     The SEA "must [m]onitor … [and] [e]nforce" the rights IDEA provides. 34 C.F.R. § 300.600; *accord* 20 U.S.C. § 1416.

74.     New Jersey regulations similarly require that "[t]he Department of Education shall monitor all programs and services required … for compliance with New Jersey Statutes, the New Jersey Administrative Code, the approved special education plan and Federal requirements under the Individuals with Disabilities Education Act (IDEA)." N.J.A.C. 6A:14-9.1(a).

75.     NJDOE's monitoring includes "review of … [p]rovision of a free, appropriate public education in the least restrictive environment," N.J.A.C. 6A:14-9.1(a)(1)(i), which may be done by reviewing data, reports, and student records, conducting on-site visits, comparing sample IEPs with the programs and services provided, developing improvement plans for areas of deficiency, and auditing state and federal funds. *See* N.J.A.C. 6A:14-9.1(b).

76.     NJDOE Defendants have failed systemically to comply with their federal law

obligations in that they have failed to put in place adequate monitoring to ensure NJDOC Defendants' compliance with IDEA, and they have failed to identify and correct the educational deficiencies alleged herein.

77.    For example, NJDOE Defendants' failures include, but are not limited to, conducting cursory inspections that did not adequately assess educational content; failing to ensure compliance with students' IEPs; approving budgets submitted under the SFEA that reflected such low levels of overall spending that NJDOE Defendants should have been alerted that there was a potential for denial of FAPE, including budgets that did not provide for funding or provided as little as $800 for an eleven month period to entire facilities that house SFEA-eligible students, such as NJSP, Northern State, and Wagner; approving budgets that reflected extremely low levels of expenditures on particular items, such as between 0–2% of projected textbook budgets actually spent and 8% of projected supplies budgets actually spent; and approving reports that reflected disproportionately low numbers of evaluations conducted in light of the number of students with IEPs in facilities.

### Plaintiffs' Individual Allegations

### Adam X.

78.    Plaintiff Adam X. is a nineteen-year-old who entered NJDOC custody in August of 2015 at the age of eighteen. Adam X. remains in NJDOC custody and is subject to the Defendants' same policies and practices.

79.    As a resident of Garden State at the time of filing, Adam X. is qualified to participate in the programs, services, and activities of NJDOC.

80.    Adam X. has been found eligible under an IDEA disability category his IEP described as "emotional disturbed." He also has been diagnosed with ADHD. These impairments

substantially limit one or more of his major life activities, making him an individual with a disability.

81.    Before entering NJDOC custody, Adam X. attended high school at two private schools designed for students with special education needs, where he had an IEP.

82.    Adam X.'s IEP required, among other forms of educational assistance, behavior modification, teacher guidance, and counseling.

83.    Adam X.'s history of attending out-of-district placements for students with special education needs should have put NJDOC Defendants on notice that Adam X. had special education needs.

84.    Despite the fact that Adam X. had an IEP when he entered NJDOC custody, NJDOC Defendants failed to implement Adam X.'s existing IEP or hold a valid Child Study Team meeting, as they are required to under state regulations implementing IDEA. Adam X. has not received special educational services at any point throughout his time in NJDOC custody and continues to be denied appropriate services, all in violation of IDEA, Section 504, the ADA, and NJLAD.

85.    When Adam X. entered NJDOC custody, he was placed in CRAF while awaiting his assignment. He received no education in CRAF.

86.    Adam X. was then placed in Mountainview, where the IEPs he received were devoid of the special education services required to meet his needs. As a result, and as described further below, Adam X. also did not receive equal access to education at Mountainview.

87.    At Mountainview, Adam X. was placed in a general education classroom despite his IEP, his history of special education placements, and what he was told were low TABE scores.

88.    For Adam X., classes at Mountainview consisted of individually working on printed worksheets. Teachers did not teach lessons to the class, but supervised the completion of these worksheets. Students who had questions about how to complete assignments could ask teachers, but teachers often did not know the answers because they taught multiple subjects in which they had no expertise. Worksheets students completed were returned weeks later, if ever.

89.    In March of 2016, Adam X. was in a fight with another inmate because of behavior attributable to his disability.

90.    While waiting to hear whether he would receive a disciplinary charge for the fight, Adam X. spent about five days in "lock-up" – an interim placement NJDOC prisoners are sent to when awaiting disciplinary action – in Mountainview, during which he was prohibited from attending school at all. Adam X. received a disciplinary charge without receiving a manifestation determination or any process to determine whether the behavior was a manifestation of his disability or whether a change of placement was appropriate in light of his disability as required by IDEA and Section 504, or without inquiry into whether the behavior was disability-related and required reasonable modifications, changes in methods of administration, revisions to eligibility criteria for education or a more integrated setting as required under the ADA and Section 504.

91.    After receiving the disciplinary charge, Adam X. was sent to administrative segregation in Wagner, where he spent three months. NJDOC Defendants failed to hold another IEP meeting due to this "change in placement," as is required under IDEA and Section 504, or to consider steps to avoid discrimination as required under the ADA and Section 504, such as determining whether administrative segregation was appropriate given his disability.

92.    While in administrative segregation, the only education Adam X. received was

one to two hours of class time in a cage in the middle of the unit. Adam X. sat in the cage with about eleven other students while the teacher stood outside of the cage. The teacher handed out packets of worksheets, which students completed and submitted. Packets were neither graded nor returned to students.

93.     Adam X. received credits but received no substantive feedback on his work from his teacher.

94.     While in administrative segregation, Adam X. was not provided with educational services, including special education, as required under IDEA and Section 504 and equal access to education as required under the ADA and Section 504. The worksheets he received constitute neither educational services (including special education) nor equal educational access.

95.     Because of his disability, Adam X. was disproportionately burdened while in administrative segregation. Administrative segregation exacerbated his disabilities. The isolation associated with administrative segregation exacerbated symptoms of his ADHD, including difficulty concentrating and increased impulsivity. These symptoms impacted not only his disability-related behavior while in administrative segregation but made it more difficult for him to focus on any education that he was offered. Administrative segregation also resulted in Adam X. falling further behind in his education because he was denied special education (and most other educational services) while in administrative segregation. Administrative segregation also deprived Adam X. of valuable time, as he only is qualified to receive special education for a limited time, *i.e.*, until June 30 of the year in which he turns twenty-one.

96.     On June 17, 2016, Adam X. was sent to Garden State, where he took a TABE to determine his educational placement.

97.     He did not meet with any member of the Child Study Team at Garden State, and

the teaching staff did not initiate any discussion about his IEP until mid-August.

98.    At Garden State, he was in general education classes with five to six other students and no special education supports. He was moved to a class that was described as a special education class. However, he was unsure whether it was actually a special education class because there was no support for his special education needs, and the teacher, the material, and the method of instruction all fell short of providing an equal educational benefit.

99.    Starting in late August of 2016, Adam X. was placed in a supplemental class on Tuesday and Thursday evenings for students who had failed the TABE. These classes were inconsistently held.

100.    Until late August of 2016, no member of NJDOC staff had spoken to him about transition planning for his vocational plans, as required by IDEA. The transition planning he received was cursory. The staff conducted a test to determine what kind of occupation might be appropriate for Adam X. The outcome of the test was a recommendation that he pursue in a career in finance. Staff did nothing further to discuss this career path with him.

101.    From about September of 2016 through about December of 2016, Adam X. was in administrative segregation at Northern State. Once again, he was locked in administrative segregation regardless of his disability. No one considered his disabilities in locking him in administrative segregation, or considered whether administrative segregation was appropriate for him.

102.    As at Wagner, at Northern State, Adam X. received educational instruction in a cage, with the teacher standing outside. He was in class alongside students of dramatically different ability levels.

103.    He returned to Garden State in December of 2016, and since then he has received

substantially similar education to the education he received before his placement in administrative segregation.

104.    As a result of these failures to comply with relevant laws and regulations, Adam X. has not received a FAPE or equal access to education.

**Brian Y.**

105.    Plaintiff Brian Y. is a nineteen-year-old who entered NJDOC custody before he turned eighteen. Brian Y. remains in NJDOC custody and is subject to the Defendants' policies and practices that are discussed herein.

106.    As a resident of Garden State at the time of filing, Brian Y. is qualified to participate in the programs, services, and activities of NJDOC.

107.    Brian Y. has been diagnosed with oppositional defiant disorder, impulse control disorder, ADHD, and an adjustment disorder. These impairments substantially limit one or more of his major life activities, making him an individual with a disability.

108.    Brian Y. has been hospitalized at least three times for mental disability-related reasons.

109.    Brian Y.'s disabilities and history of disability-related behavior problems adversely impacted his educational performance.

110.    Brian Y. attended a local public school before his arrest and subsequent incarceration. In the year prior to his arrest, Brian Y. received failing grades in five of eight courses and Ds in two other courses. He also missed sixty-six days of school during the 2012 school year.

111.    Brian Y. knows that the Garden State staff is aware that he has an adjustment disorder because staff discussed this with him. He also had bi-weekly meetings with a mental

health counselor during his time in Garden State.

112. NJDOC Defendants never developed an IEP for Brian Y. Instead, they developed an IPP for Brian Y. as a general education (not special education) student. His most recent IPP, including his TABE scores, indicates that his academic levels are still well below grade level.

113. Brian Y.'s history of hospitalizations, disability-related behavior, and extremely low academic performance should have put NJDOC Defendants on notice that Brian Y. had special education and disability-related needs, but, in violation of NJDOC Defendants' Child Find obligation under IDEA and Section 504, NJDOC Defendants failed to provide Brian Y. with an appropriate education evaluation and develop an IEP for him. NJDOC Defendants also failed to identify and track Brian Y. and the reasonable modifications he requires, as required by the ADA and Section 504.

114. When Brian Y. informed Garden State that it failed to identify him as a student with a disability in need of special education and related services and reasonable modifications, staff responded that NJDOC was not legally obligated to do so.

115. When Brian Y. entered NJDOC custody, he was placed in Garden State's youth unit. Brian Y.'s education at Garden State consisted of classes with one teacher and approximately six other students from different grade levels, which made it difficult for the teacher to differentiate instruction based on students' needs. Since the teacher was trained in history, history was the only subject he taught the students. For all other subjects, the students individually worked on worksheets. Students who had questions about how to complete assignments could ask the teacher, who often did not know the answers to their questions because he taught multiple subjects in which he had no expertise. The teacher told the students to ask other students if they needed help. Brian Y. did not receive any extra help or educational

supports for his classes. Brian Y. did not receive any feedback or grades on his work, only credits for completing the worksheets.

116.    Brian Y. also attended a supplemental class several nights per week for students who received low scores on the TABE. Frequently, Brian Y. was given the same worksheets that he had already completed in his regular classroom.

117.    NJDOC Defendants transferred Brian Y. to Garden State's general population in November of 2015, where his education consisted of attending classes for about five hours per day. Students from all different grade levels were in the same classes, but unlike the youth unit, classes were separated according to subject with different teachers for each. Rather than differentiate instruction, most of the classwork consisted of individually working on worksheets that were supposed to be at the student's individual level. Brian Y. still did not receive any extra help or educational supports.

118.    In January of 2016, Brian Y. was threatened with a disciplinary charge. While waiting to hear whether he would receive a disciplinary charge, Brian Y. spent approximately four days in "lock-up" in Garden State, during which he was prohibited from attending school at all.

119.    Brian Y. received a disciplinary charge. Garden State failed to determine whether the behavior was disability-related. No one considered his disability before locking him in administrative segregation, or even whether administrative segregation was appropriate in light of his disability.

120.    Brian Y. was sent to administrative segregation at Wagner, where he spent about six months. NJDOC Defendants failed to hold another IEP meeting as is required under IDEA and Section 504 due to this "change in placement," or to consider reasonable modifications to

avoid discrimination on the basis of disability as is required under the ADA and Section 504.

121.    For about the first month that Brian Y. spent in administrative segregation, he received no education whatsoever.

122.    In early February of 2016, Wagner started a daily education program and other services that Brian Y. attended, including a mental health support group that met twice per week.

123.    Brian Y.'s daily education program consisted of two hours of class time in a cage in the middle of the unit. Brian Y. sat in the middle of the cage with the other students while one teacher stood outside of the cage with a chalkboard. The teacher provided direct instruction through the cage sporadically. There were no other instructors or academic supports in the cage. The same worksheets were distributed to all of the students, regardless of grade level. If the students needed help, they could ask the teacher questions through the cage. Brian Y. received no substantive feedback on his work. This instruction did not include educational services as required under IDEA and Section 504, and did not provide equal educational access as required under the ADA and Section 504. The worksheets he received constitute neither educational services (including special education) nor equal access to education.

124.    Brian Y. spoke with a mental health counselor during his time in administrative segregation about his disabilities and the fact that administrative segregation and going to school in a cage were exacerbating the symptoms of his disability.

125.    Because of his disabilities, Brian Y. was disproportionately burdened while in administrative segregation. Administrative segregation exacerbated his disabilities such that his anger stemming from his mental disabilities grew worse, making it difficult for him to concentrate. Both of these effects impacted not only his disability-related behavior while in administrative segregation but made it more difficult to focus on any education that he was

offered. Administrative segregation also resulted in Brian Y. falling further behind in his education since he was denied special education (and most other educational services) while in administrative segregation. In fact, school in the cage did not offer the remaining courses that Brian Y. needed to graduate, so he made no meaningful educational progress while attending school in administrative segregation. Administrative segregation also takes away valuable time for Brian Y. to receive special education because he is qualified for special education for a limited time, *i.e.*, until June 30 of the year in which he turns twenty-one. All of these impacts are due to the fact that Brian Y. had disabilities while in administrative segregation.

126.   In July of 2016, Brian Y. was sent back to Garden State, where he was held for about seven days in isolation in temporary close custody. He received no education services during this time.

127.   After NJDOC Defendants sent Brian Y. to general population from temporary close custody, he received no educational services for one week. Then Brian Y. attended class five days per week and completed his remaining credits, but the classes continued to be deficient, as previously described.

### Casey Z.

128.   Plaintiff Casey Z. is a twenty-one-year-old who entered NJDOC custody in July of 2015 when he was nineteen. Casey Z. remains in NJDOC custody currently and is subject to the Defendants' policies and practices discussed herein.

129.   As a resident of NJSP at the time of filing, Casey Z. is qualified to participate in the programs, services, and activities of NJDOC.

130.   Casey Z. has been diagnosed with a specific learning disability, one of the disabilities covered by IDEA.  He has also been diagnosed with ADHD, an adjustment disorder,

a conduct disorder, and was diagnosed with lead poisoning at the age of two. These impairments substantially limit one or more of his major life activities, making him an individual with a disability.

131.    Until recently, Casey Z. received Remeron, an antidepressant used to treat people with a major depressive order, from NJDOC.

132.    Prior to Casey Z.'s arrest, he was hospitalized multiple times for mental-disability related reasons.

133.    Casey Z. received special education services in his public middle and high schools before entering NJDOC custody. He has been eligible for special education and related services since elementary school. Until 2009, Casey Z. had a full-time personal aide throughout his school day.

134.    Casey Z. was arrested in January of 2012 and had received an IEP shortly before that time – in November of 2011 – from his local public high school that made him eligible for special education and related services under the category of "specific learning disability." His academic levels in this 2011 IEP, based on a basic skills assessment, were well below his grade level (6.6 in Math and 2.9 in Verbal-Reading Comprehension).

135.    Casey Z.'s 2011 IEP (1) provided for 160 minutes of instruction in a special education setting for Language Arts, Math, Science, and Social Studies and (2) noted that Casey Z.'s behavior "impedes his or her learning or that of others" and listed behavioral interventions to correct his irregular attendance, which included positive behavioral interventions and supports.

136.    Casey Z. entered Essex County Juvenile Detention Center ("ECJDC") in January of 2012. Casey Z. was sixteen at the time. The JJC administered a TABE, which appeared to

show that Casey Z. was on an eighth grade reading level, sixth grade language arts level, and fifth grade math level. ECJDC officials subsequently developed an IEP for Casey Z. on April 3, 2013, and he attended classes at ECJDC.

137.    According to Casey Z.'s science teacher at ECJDC, Casey Z. was "significantly behind academically" at that time, Casey Z. "struggles" with reading comprehension, math, verbal expression, and age and grade appropriate work. "[Casey Z.] is academically behind and, of course, never benefits academically when he is removed from the educational setting due to his misbehavior. [Casey Z.] benefits from a 'one on one' aid to help him with reading comprehension."

138.    Nevertheless, ECJDC placed Casey Z. in a full inclusion setting. Casey Z.'s new IEP reduced his special education instruction from 160 minutes per day to zero, placed him in a general education setting, eliminated all related services, and left the Proactive Behavior Management Plan blank.

139.    By the time Casey Z. entered NJDOC custody in July of 2015, his long history of receiving special education services should have put NJDOC Defendants on notice that Casey Z. had special education needs.

140.    Despite Casey Z. having an IEP when he transferred into NJDOC custody, Defendants failed to implement Casey Z.'s existing IEP or hold a valid Child Study Team meeting. Casey Z. has not received special educational services at any point throughout his time in NJDOC custody and continues to be denied appropriate services, all in violation of IDEA, Section 504, and the ADA.

141.    When Casey Z. entered NJDOC custody, he was transferred to NJSP in July of 2015, a facility that does not have the capacity to provide appropriate special education services.

142.   NJDOC Defendants gave Casey Z. the TABE on July 30, 2015 and enrolled him in adult basic education classes at NJSP. Casey Z. attended classes every day for about four hours. There were approximately eight other students in his class, one teacher, and two fellow inmates who were supposed to help the students with their work. The students were all from different grades. Casey Z. worked on worksheets. The teacher told Casey Z. that if he needed help, he should ask the other inmates who served as tutors. There was very little direct instruction, and Casey Z. did not receive any special education or related services.

143.   Even though NJDOC Defendants should have been aware of Casey Z.'s special educational needs from his school records and JJC educational records, Casey Z. put Defendants on notice in writing about his special educational needs at least three times between August 19 and December 16, 2015. In response, an NJSP official told Casey Z. that because of the length of his prison sentence, prison is his last stop and he was not entitled to special education services.

144.   Cynthia Johnson, Assistant Superintendent of NJSP, later wrote that Casey Z. was entitled to a FAPE, but said he was receiving one because he "received the same services as any other student classified in need of special education."

145.   After Casey Z.'s numerous grievances regarding the denial of special education services, NJSP finally modified Casey Z.'s IEP in March of 2016, but even that IEP was inadequate, in that it did not provide for the services it noted Casey Z. needs.

146.   Moreover, NJDOC Defendants did not even implement the modified IEP as Casey Z. remained in the same classroom without additional support.

147.   On two occasions, Casey Z. has received placement in administrative segregation as a punishment, totaling more than six months. These punishments have been imposed without any manifestation determination or IEP meeting for his change of placement, and without any

process to determine what educational services he required in his changed educational placement as required by IDEA and Section 504, or without inquiry into whether the behavior was disability-related and required reasonable modifications as required under the ADA and Section 504.

148.    When Casey Z. has been locked in administrative segregation, he has been put there regardless of his disability. No one has tracked his disability status and need for reasonable modifications. No one has inquired into whether his disabilities should have been considered in locking him in administrative segregation, or even whether administrative segregation is appropriate for him considering his disabilities.

149.    While in administrative segregation, the education he has received has ranged from absolutely no services to worksheets in his cell every three to four days, without leaving his cell for classes. Casey Z. reports that other students in administrative segregation attend school in a cage on a different floor.

150.    In administrative segregation, Casey Z. has not been provided with educational services, including special education, as required under IDEA and Section 504 and equal educational access as required under the ADA and Section 504. The worksheets he received constituted neither educational services (including special education) nor equal access to education.

151.    Because of his disability, Casey Z. is disproportionately burdened while in administrative segregation. When he was first placed in administrative segregation, Casey Z. experienced depression attributable to his worsening pre-existing mental disabilities. The depression he suffered also interfered with his ability to focus. Administrative segregation also results in Casey Z. falling further behind in his education since he is denied special education

(and most other educational services) while in administrative segregation. Administrative segregation takes away valuable time for Casey Z. to receive special education because he is qualified for special education for a limited time, *i.e.*, until June 30 of the year in which he turns twenty-one, making it much more difficult for him to receive a diploma. All of these impacts are due to the fact that Casey Z. has a disability while in administrative segregation.

### Organizational Plaintiff ACLU-NJ's Allegations

152.    The Defendants' actions have perceptibly impaired the ACLU-NJ's mission by requiring the ACLU-NJ to divert resources from other core mission areas – such as advocacy on behalf of New Jerseyans' First Amendment rights – in order to address the educational deficiency the Defendants' conduct has produced in NJDOC facilities.

153.    The ACLU-NJ learned of educational deprivation in JJC and NJDOC facilities through its work on solitary confinement for juveniles, a core ACLU-NJ concern. At the time the ACLU-NJ learned of this deprivation, no one on the ACLU-NJ's staff had the capacity to challenge the educational deficiencies in New Jersey prisons. Nevertheless, the ACLU-NJ received phone calls seeking legal assistance from prisoners facing educational deprivations, the issue was a concern to ACLU-NJ members, and the ACLU-NJ's broad goal of improving educational equality in New Jersey could not be met without addressing education in prisons. In order to meet this need, in September of 2015 the ACLU-NJ diverted resources to hire a legal fellow to address the education rights of incarcerated students. The ACLU-NJ legal staff included four lawyers before the fellow was hired, and so in hiring a fellow with a significant focus on pursuing educational rights for incarcerated students, it devoted a substantial percent of its legal staff time to this issue.

154.    Since that time, the ACLU-NJ has devoted considerable resources to representing

an individual plaintiff in an education action in the Office of Administrative Law against NJDOC.

155.    An ACLU-NJ staff member has also conducted a training for volunteer lawyers to represent incarcerated young people who wish to bring their educational claims against NJDOC.

156.    The ACLU-NJ has suffered an injury-in-fact because it has diverted resources away from pursuing other elements of its mission in order to address the issue of inadequate education for young people incarcerated in NJDOC facilities.

157.    In addition, if the ACLU-NJ did not divert resources to improve education within facilities, its core mission generally would be negatively impacted. The ACLU-NJ has long worked to ensure that conditions in prison meet constitutional standards, and in particular that prison officials conform to requirements under the First and Eighth Amendments. Activities within prisons are shielded from outside view, and so in identifying and addressing constitutional violations within prisons, the ACLU-NJ relies on people within those prisons to alert the organization to violations. Prisoners' abilities to identify violations and locate the ACLU-NJ as a source for litigation to remedy injuries is dramatically improved when they have received an adequate high school education, including meaningful instruction in reading, writing, and critical reasoning. In the absence of such instruction, the ACLU-NJ's ability to identify and remedy constitutional violations within NJDOC prisons will be significantly reduced.

158.    The injury of having to divert resources to address the dearth of adequate education in prisons is directly traceable to the actions of NJDOC Defendants in failing to provide adequate education for students with special education needs and to the actions of NJDOE Defendants in failing to oversee NJDOC Defendants' provision of education.

159.    This injury is redressable by the Defendants. If NJDOC Defendants adequately

provided, and NJDOE Defendants adequately supervised, education to students with special education needs in NJDOC facilities, the ACLU-NJ would re-direct resources toward its other priority areas.

160. The ACLU-NJ also has members who have suffered injury due to Defendants' actions and inactions. These members are incarcerated young people in adult facilities who are denied special education and equal access to special education and who have been locked in administrative segregation regardless of their disabilities. Members also include parents of young people with disabilities who can pursue their children's claims for denial of special education and equal access to education on behalf of their children.

161. These members are directly injured by NJDOC Defendants' practices – for those members who are students themselves, the time in NJDOC custody is often their last opportunity to receive a high school education responsive to their special education needs. When NJDOC Defendants fail to provide such an education and NJDOE Defendants fail to ensure that they do so, these young people are deprived of their right to such an education. The injuries they suffer are described further below.

162. These members would have standing to sue in their own right, and the injuries they experience are germane to the purpose of the ACLU-NJ, as described above.

163. Moreover, because Plaintiffs seek relief for system-wide failures by the Defendants to comply with laws concerning special education, these claims are not redressable through individual actions and instead require system-wide resolution. As a result, neither the claim asserted nor the relief requested requires the participation of individual members in the suit.

## CAUSES OF ACTION

### Count I

### Violation of Individuals with Disabilities Education Act
### (20 U.S.C. § 1400, *et seq*.)

164.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

165.    Under the Individuals with Disabilities Education Act, students with disabilities are entitled to receive a free appropriate public education. 20 U.S.C. § 1400(d)(1)(a).

166.    IDEA defines a child with a disability as a child "with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance … orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities … who, by reason thereof, needs special education and related services." 20 U.S.C. § 1401(3).

167.    Each of the named individual plaintiffs has a mental disability as defined under IDEA. The Plaintiff Class is defined to be a subset of eligible students under IDEA, namely those with mental disabilities, including disabilities such as a serious emotional disturbance, autism, and specific learning disabilities. Therefore, Plaintiffs and the Plaintiff Class qualify as students with disabilities for the purposes of IDEA.

168.    As a public agency, NJDOC has a duty to provide FAPE to all school-eligible persons with disabilities under the age of eighteen who are incarcerated in adult correctional facilities, 34 C.F.R. 300.2(b), and all school-eligible persons with disabilities between the ages of eighteen and twenty-one who were either "identified as a child with a disability under § 300.8 and had received services in accordance with an IEP, but who left school prior to their incarceration; or [d]id not have an IEP in their last educational setting, but who had actually been

38

identified as a child with a disability under § 300.8." 34 C.F.R. § 300.102(a)(2)(ii); 20 U.S.C. § 1412(a)(1)(B)*; see also* N.J.A.C. 6A:17-3.

169.    NJDOE Defendants have failed to meet their obligations of ensuring that NJDOC Defendants comply with state and federal education laws for incarcerated students with special education needs.

170.    IDEA and state implementing regulations require NJDOC Defendants to meet certain obligations including, but not limited to:

<ol type="a">
<li>Obtaining education records in a timely manner when a student transfers into a facility, N.J.A.C. 6A:14-4.1;</li>

<li>Providing a free appropriate public education to all students with disabilities, 20 U.S.C. § 1400(d)(1)(a), in the least restrictive environment, 34 C.F.R. §§ 300.550–300.556;</li>

<li>Identifying, locating, and evaluating students with disabilities, 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(a);</li>

<li>Upon identification, conducting a full and individual initial evaluation before initially providing special education and related services, and thereafter a re-evaluation every three years, 20 U.S.C. § 1414(a)(1)(A), (2)(B), or whenever educational or related services needs, including improved academic achievement or functional performance, call for it, 34 C.F.R. § 300.303(a);</li>

<li>Developing and implementing an appropriate Individualized Education Program for each child with a disability, in accordance with 20 U.S.C. § 1414(d);</li>
</ol>

f) Holding meetings to review and revise the IEP as required by 20 U.S.C. § 1414(d)(4);

g) Holding Child Study Team meetings (consisting of a school psychologist, a learning disabilities teacher/consultant, and a school social worker) to evaluate a student and develop, review and/or modify a student's IEP, N.J.A.C. 6A:14-2.3; 3.1; 34 C.F.R. § 300.344–45;

h) Providing "related services" that a child with a disability may need in order to benefit from their education, 20 U.S.C. § 1401(26)(A);

i) Offering a continuum of alternative placements to meet the needs of students with disabilities for special education and related services, 34 C.F.R. § 300.115;

j) When students with an IEP enter a new school district, providing "comparable services" to their previous IEP for thirty days and then either adopting the prior IEP or developing, adopting, and implementing a new IEP, 20 U.S.C. § 1414(d)(2)(C); 34 C.F.R. § 300.323(e);

k) Providing transition services for students who will leave NJDOC custody before the month of June after they turn twenty-one, 20 U.S.C. § 1412(a)(1)(A); *id.* at 1414(d)(7)(A)(ii);

l) If behavior leads to removal from school for more than ten days or to removal for less than ten days but is based on behavior that constitutes a pattern, continuing to provide educational services so as to enable the child to continue to participate in the general education curriculum, 34

C.F.R. § 300.530(d)(1)(i), and convening an immediate IEP meeting to
determine if the behavior is a manifestation of the student's disability,
20 U.S.C. § 1415(k); 34 C.F.R. § 300.530(e); 34 C.F.R. §
300.536(a)(2);

m) If the behavior is a manifestation of disability, (1) conducting a
functional behavior/analysis assessment and implementing a
behavioral intervention plan; or (2) reviewing and modifying an
existing behavioral intervention plan; and (3) returning student to a
placement from which he or she was removed, except in certain
circumstances, 20 U.S.C. § 1415(k)(1)(f); 34 C.F.R. § 300.530(f)–(g),
and if the behavior was not a manifestation of disability, providing
FAPE and services to the student no later than the eleventh cumulative
day of removal, 20 U.S.C. § 1415(k)(1)(C); 34 C.F.R. § 300.530(c);
and

n) If the IEP team determines that the child presents "a bona fide security
or compelling penological interest that cannot otherwise be
accommodated," 34 C.F.R. § 300.324(d)(2), modifying the IEP to
maintain appropriate educational services.

171.    By failing to identify, evaluate, recommend, and then provide a FAPE (including
appropriate IEPs, special education, and related services to eligible students in NJDOC custody),
and by failing to provide procedural safeguards specified in the statute implementing IDEA
(including manifestation determinations), Defendants have impeded students' rights to a free
appropriate public education and/or have deprived students of educational benefits.

172.    Similarly, by failing to meet IDEA requirements, including providing FAPE, to students with disabilities who are locked in administrative segregation, NJDOC Defendants have impeded students' rights to a free appropriate public education and/or deprived students of educational benefits. NJDOE Defendants have failed to provide adequate oversight and monitoring to prevent these shortcomings, and so have violated their obligations under IDEA.

173.    As a result, Defendants have violated and continue to violate rights secured by 20 U.S.C. §§ 1400 *et seq.*, and its implementing regulations at 34 C.F.R. §§ 300 *et seq.*

174.    Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Further, as a direct result of Defendants' actions, Plaintiffs and members of the Plaintiff Class are suffering irreparable harm, including lost education opportunities. Therefore, speedy and immediate relief is appropriate.

175.    Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs incurred in bringing this action under 20 U.S.C. § 1415(i)(3).

## Count II

### Violation of Americans with Disabilities Act
### (42 U.S.C. § 12101, *et seq.*)

176.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

177.    Title II of the ADA states, in pertinent part:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any such entity. 42 U.S.C. § 12132.

178.    A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).

179.    Defendants were, at all times relevant to this action, and currently are "public entities" within the meaning of Title II of the ADA.

180.    Defendants provided and provide "services, programs and activities" including educational programs, services, and activities in NJDOC facilities.

181.    The term "disability" includes physical and mental impairments that substantially limit one or more major life activities. 42 U.S.C. § 12102(2). A "'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices … meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

182.    Plaintiffs Adam X., Brian Y. and Casey Z., and all others similarly situated were, at all times relevant to this action, and are currently "qualified individuals with disabilities" within the meaning of Title II of the ADA. They all have impairments that substantially limit a major life activity, and they are all incarcerated in NJDOC facilities and, thus, qualified – with or without reasonable modification – to participate in the programs, services, and activities of NJDOC facilities.

183.    Defendants have violated the rights of Plaintiffs and members of the Plaintiff Class secured by Title II of the ADA and its implementing regulations. *See* 42 U.S.C. § 12134; 28 C.F.R. § 35.101 *et seq.*

184.    Defendants have denied Plaintiffs and members of the Plaintiff Class equal access to education when they have provided absolutely no educational services, including those needed by youth with disabilities. Such times include those when Plaintiffs and members of the Plaintiff Class are in various types of administrative segregation. Similarly, while awaiting disposition on

their disciplinary charges in lock-up areas, Plaintiffs and members of the Plaintiff Class are denied educational services of any kind. Additionally, when Plaintiffs and members of the Plaintiff Class are placed in CRAF, they receive no educational services whatsoever. This conduct violates, among other provisions, 28 C.F.R. § 35.130(b)(1)(i).

185.    Even when educational services are offered either in the schools or in administrative segregation, the opportunity to benefit from the educational services that are offered is not equal to or the educational services are not as effective in affording equal opportunity as those offered to non-disabled students. This conduct violates, among other provisions, 28 C.F.R. § 35.130(b)(1)(ii).

186.    Defendants fail to provide Plaintiffs and members of the Plaintiff Class with the educational services they require, because of their disabilities, that are as effective as those services available to their non-disabled peers in affording youth with disabilities equal opportunity: (1) to obtain the same result, (2) to gain the same benefit, and (3) to reach the same level of achievement as their non-disabled peers. Providing worksheets to youth with disabilities who struggle to read, let alone grasp new concepts, results only in frustration, not education. As such, the educational services offered in NJDOC facilities are not sufficient to provide equal access to education for Plaintiffs and members of the Plaintiff Class. This conduct violates, among other provisions, 28 C.F.R. § 35.130(b)(1)(iii).

187.    NJDOC Defendants do not appropriately consider the disability-related educational needs of youths when assigning them to be housed in various facilities. As a result, youth with disabilities are placed in facilities that cannot provide equal access to education regardless of their disability-related educational needs. 28 C.F.R. § 35.130(b)(1)(vii).

188.    Defendants fail to make reasonable modifications to their policies, practices, and

procedures even though these modifications are necessary to avoid discriminating against Plaintiffs and members of the Plaintiff Class, in violation of 28 C.F.R. § 35.130(b)(7).

189.   Specifically, NJDOC Defendants fail to make reasonable modifications to their educational services to ensure that youth with disabilities have equal access to education. Such reasonable modifications may include, but not be limited to, providing additional qualified instructors in the classroom, one-on-one tutoring, and assistance in completing assignments.

190.   NJDOC Defendants have adopted and implemented policies and practices with regard to administrative segregation that place a disproportionate burden on Plaintiffs and members of the Plaintiff Class. Specifically, NJDOC Defendants impose and apply eligibility criteria by providing more robust educational services to youth who are not locked in any type of administrative segregation. Such eligibility criteria tend to screen out youth with disabilities from equally enjoying Defendants' educational services. Administrative segregation exacerbates their disabilities and causes youth with disabilities to fall further behind in their education because the educational services, or lack thereof, offered in administrative segregation are inadequate and because every day young people spend in administrative segregation is one day less that they have of legally required special education. This conduct violates, among other provisions, 28 C.F.R. § 35.130(b)(8).

191.   NJDOC Defendants use methods of administration that have the effect of subjecting Plaintiffs and members of the Plaintiff Class to discrimination by reason of their disability because NJDOC Defendants fail to identify and track Plaintiffs and members of the Plaintiff Class who require reasonable modifications, inquire into whether the behaviors leading to discipline are disability-related in assigning consequences, and consider whether certain disciplinary measures are appropriate for youth with disabilities. Moreover, administrative

segregation for young people with disabilities only exacerbates these disabilities and puts young people further behind in their education. As such, these methods of administration also have the purpose and effect of defeating or substantially impairing accomplishments of the objectives of Defendants' educational services with respect to Plaintiffs and members of the Plaintiff Class because these young people with disabilities are denied equal access to education. This conduct violates, among other provisions, 28 C.F.R. § 35.130(b)(3)(i) and (ii).

192.    NJDOC Defendants and NJDOE Defendants aid and perpetuate discrimination against persons with disabilities in their programs, services, or activities by maintaining policies and practices that allow for discrimination by each Defendant and that permit the discrimination of the other co-Defendant to continue unchecked, in violation of 28 C.F.R. § 35.130(b)(1)(v).

193.    Defendants also violate the ADA's integration mandate by failing to provide services in the most integrated setting appropriate for students with disabilities, in violation of 28 C.F.R. § 35.130(d), *see also* 28 C.F.R. § 35.152, by keeping students in administrative segregation, where they are more likely to receive services in a population that disproportionately includes people with disabilities.

194.    Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Further, as a direct result of Defendants' actions, Plaintiffs and members of the Plaintiff Class are suffering irreparable harm, including lost education opportunities. Therefore, speedy and immediate relief is appropriate.

195.    Pursuant to 42 U.S.C. § 12133, Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs incurred in bringing this action under 42 U.S.C. § 12205.

**Count III**

**Violation of Section 504 of the Rehabilitation Act of 1973**
**(29 U.S.C. § 794)**

196.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

197.    Section 504 provides, in pertinent part:

> No otherwise qualified individual with a disability in the United States … shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance[.]  29 U.S.C. § 794(a).

198.    Each Defendant was, at all times relevant to this action, and is currently a recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, and each Defendant provided and provides a "program or activity" where "program or activity" is described as "all the operations of" the recipient, which includes the educational programs and activities in NJDOC facilities. 29 U.S.C. § 794(b).

199.    Plaintiffs and members of the Plaintiff Class were, at all times relevant to this action, and are currently "otherwise qualified individuals with disabilities" within the meaning of Section 504. They all have impairments that substantially limit a major life activity, and they were and/or are all incarcerated in NJDOC facilities and qualified—with or without reasonable modification—to participate in the educational services of NJDOC facilities.

200.    Defendants have violated the rights of Plaintiffs and members of the Plaintiff Class secured by Section 504 and its implementing regulations. *See* 28 C.F.R. § 41.1.

201.    The denial of educational services includes times when there are no educational services whatsoever, including those needed by persons with disabilities. Such times include those when Plaintiffs and members of the Plaintiff Class are in various types of administrative

segregation. Similarly, while awaiting disposition on their disciplinary charges in lock-up areas, Plaintiffs and members of the Plaintiff Class are completely denied educational services. Additionally, when Plaintiffs and members of the Plaintiff Class are placed in CRAF, they receive no educational services whatsoever. This conduct violates, among other provisions, 45 C.F.R. § 84.4(b)(1)(i).

202.    Even when educational services are offered either in the schools or in administrative segregation, the opportunity to benefit from the educational services that are offered is not equal to or the educational services are not as effective in affording equal opportunity as those offered to non-disabled students. This conduct violates, among other provisions, 45 C.F.R. § 84.4(b)(1)(ii).

203.    Defendants fail to provide Plaintiffs and members of the Plaintiff Class with the necessary educational services because of their disabilities that are as effective in affording youth with disabilities equal opportunity to obtain the same result, to gain the same benefit, and to reach the same level of achievement as their non-disabled peers. For instance, providing worksheets without instruction may offer some (albeit limited) education to non-disabled youth; but providing worksheets to youth with disabilities who struggle to read, let alone grasp new concepts, results only in frustration, not education. As such, the educational services offered in NJDOC facilities are not sufficient to provide equal access to education for Plaintiffs and members of the Plaintiff Class. This conduct violates, among other provisions, 45 C.F.R. § 84.4(b)(1)(iii).

204.    Even in its other programs, services, and activities, NJDOC Defendants violate Section 504 regulations. NJDOC Defendants do not appropriately consider the disability-related educational needs of young people with disabilities when assigning them to be housed at various

facilities. As a result, young people with disabilities are placed in facilities that cannot provide equal access to education regardless of their disability-related educational needs. This conduct violates, among other provisions, 45 C.F.R. § 84.4(b)(1)(vii).

205.    Defendants fail to make reasonable modifications to their policies, practices, and procedures even though such modifications are necessary to avoid discriminating against Plaintiffs and members of the Plaintiff Class in violation of Section 504.

206.    Specifically, NJDOC Defendants fail to make reasonable modifications to their educational services to ensure that youth with disabilities have equal access to education. Such reasonable modifications may include, but not be limited to, providing additional qualified instructors in the classroom, one-on-one tutoring, and assistance in completing assignments.

207.    NJDOC Defendants use methods of administration, including, but not limited to, denying educational services while youth with disabilities are in administrative segregation, that have the effect of subjecting Plaintiffs and members of the Plaintiff Class to discrimination by reason of their disability because NJDOC Defendants fail to identify and track Plaintiffs and members of the Plaintiff Class who require reasonable modifications, inquire into whether the behaviors leading to discipline are disability-related in assigning consequences, and consider whether certain disciplinary measures are appropriate for youth with disabilities. Moreover, administrative segregation for young people with disabilities only exacerbates young people's disabilities and puts them further behind in their education. As a result, these methods of administration also have the purpose and effect of defeating or substantially impairing accomplishments of the objectives of Defendants' educational services with respect to Plaintiffs and members of the Plaintiff Class because they are denied equal access to education. This conduct violates, among other provisions, 45 C.F.R. § 84.4(b)(4)(i) and (ii).

208.    Defendants aid and perpetuate discrimination against persons with disabilities in Defendants' programs, services or activities by maintaining policies and practices that allow for discrimination and that permit the discrimination of each co-Defendant to continue unchecked, in violation of 45 C.F.R. § 84.4(b)(1)(v).

209.    Defendants deny Plaintiffs and members of the Plaintiff Class FAPE as secured by Section 504's regulations by:

    a)  Failing to identify and locate all qualified handicapped persons in the Defendants' jurisdiction, 45 C.F.R. § 84.32(a);

    b)  Failing to provide a free appropriate public education to each qualified handicapped person who is in NJDOC's custody or jurisdiction, 45 C.F.R. § 84.33(a);

    c)  Failing to provide special education and related aids and services that are designed to meet the individual educational needs of handicapped persons as adequately as the needs of non-handicapped persons are met, 45 C.F.R. § 84.33(b).

210.    Because Defendants' discriminatory conduct is ongoing, declaratory relief and injunctive relief are appropriate remedies. Further, as a direct result of Defendants' actions, Plaintiffs and members of the Plaintiff Class are suffering irreparable harm, including lost educational opportunities. Therefore, speedy and immediate relief is appropriate.

211.    Pursuant to 29 U.S.C. § 794(a), Plaintiffs are entitled to declaratory and injunctive relief and to reasonable attorneys' fees and costs incurred in bringing this action.

**Count IV**

**Violation of the New Jersey Civil Rights Act**
**(N.J.S.A. 10:6-1, *et seq.*)**

212.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if specifically alleged herein.

213.    Under the New Jersey Civil Rights Act, "Any person who has been deprived of … any substantive rights, privileges or immunities secured by the Constitution or laws of this State … may bring a civil action for damages and for injunctive or other appropriate relief." N.J.S.A. 10:6-2(c).

214.    Because of the actions of Defendants, as described herein, Plaintiffs have been deprived of their rights to equal protection and due process of law protected by Article I, Paragraph 1 of the New Jersey Constitution, which provides that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."

215.    In addition to deprivations of constitutional rights, Defendants have deprived Plaintiffs of their statutory rights. As described herein, Plaintiffs have been deprived of their right to due process under the SFEA, which provides that the "due process rights available to children, parents and guardians in the public schools on matters of educational classification or educational program shall be available to children, parents and guardians in State facilities." N.J.S.A. 10A:7B-7(c).

216.    Plaintiffs have been further deprived of their rights by the Defendants who have failed to provide a sufficient system of administrative reviews, including meetings between pupils and NJDOC Director of Educational Services, to review educational classification and

educational programs in violation of the SFEA. N.J.S.A. 18A:7B-7(b).

217.    Plaintiffs also have been deprived by NJDOE Defendants, who, as described herein, have failed to review the operations of NJDOC educational programs and remediate programs that do not meet regulatory standards, in violation of the SFEA. N.J.S.A. 18A:7B-5.

218.    Chapter 14 of N.J.A.C. 6A governs special education in New Jersey, and N.J.A.C. 6A:14-8 concerns special education programs operated by NJDOC Defendants. N.J.A.C. 6A:14-8 provides that "[s]pecial education programs provided in State facilities shall be operated in accordance with N.J.A.C. 6A:17-3 and the requirements of this chapter." N.J.A.C. 6A:17-3 governs "Educational Programs for Students in State Facilities."

219.    Both Chapter 14 and Chapter 17 of N.J.A.C. 6A require NJDOC Defendants to provide education to students in their custody in conformity with IDEA, the ADA, and Section 504.

220.    In violation of N.J.A.C. 6A:14 and 17, the Defendants have failed to, *inter alia*, obtain student records when students enter NJDOC custody in order to identify youth who have been receiving special education or youth who should be receiving special education, convene appropriate educational planning meetings, timely adopt or develop new IEPs, provide education for an adequate amount of time each day, provide academic content conforming to state standards, provide education in the least restrictive environment, provide a comparable education program to the programs outlined in students' IEPs, conduct manifestation determinations before imposing discipline, conduct IEP meetings when discipline-related detention removes students from their normal academic instruction, provide education consistent with a student's IEP when he is removed from his normal classroom for disciplinary reasons, and timely work with school districts to help students obtain diplomas. As a result of these procedural violations of the New

Jersey Administrative Code, NJDOC Defendants have failed to provide a FAPE to students in their facilities who are entitled to special education and have violated students' equal protection and due process rights under Article I, Paragraph 1 of the New Jersey Constitution.

221.    As described herein, these violations and the resulting harms are consequences of Defendants' policies and practices.

222.    Because of these violations of education regulations, and pursuant to N.J.S.A. 10:6-2(b), Plaintiffs are entitled to declaratory and injunctive relief and to recover from Defendants the reasonable attorneys' fees and costs incurred in bringing this action.

<u>Count V</u>

**Violation of the New Jersey Law Against Discrimination**
**(N.J.S.A. 10:5-1, *et seq.*)**

223.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if specifically alleged herein.

224.    Plaintiffs Adam X., Brian Y., and Casey Z., and all students similarly situated are qualified individuals with disabilities and are disabled within the meaning of the New Jersey Law Against Discrimination. N.J.S.A. 10:5-1 to 14.1.

225.    Under NJLAD, N.J.S.A. 10:5-1 *et seq.*,

> All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex, gender identity or expression or source of lawful income used for rental or mortgage payments, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right. N.J.S.A. 10:5-4.

226.    Educational services in NJDOC facilities are accommodations, advantages, and privileges offered by Defendants.

53

227.    NJLAD is interpreted identically to the ADA, and Plaintiffs thus specifically incorporate paragraphs 176–95 in support of their claims under NJLAD.

228.    Pursuant to N.J.S.A. 10:5-13, Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs incurred in bringing this action.

## **PRAYER FOR RELIEF**

*Wherefore*, Plaintiffs, individually and on behalf of the class they represent, ask the Court to:

1. Order that Plaintiffs may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

2. Order and declare that the Defendants' conduct as alleged herein has violated, and continues to violate, IDEA, 20 U.S.C. §§ 1400 *et seq.*, and accompanying regulations; the ADA, 42 U.S.C. §§ 12101 *et seq.*, and accompanying regulations; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and accompanying regulations; NJCRA, 10:6-*1 et seq.*, and accompanying regulations; and NJLAD, 10:5-1 *et seq.*, and accompanying regulations;

3. Preliminarily and permanently enjoin Defendants from violating IDEA, 20 U.S.C. §§ 1400 *et seq.*, and accompanying regulations; the ADA, 42 U.S.C. §§ 12101 *et seq.*, and accompanying regulations; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and accompanying regulations; NJCRA, 10:6-1 *et seq.*, and accompanying regulations; and NJLAD, 10:5-1 *et seq.*, and accompanying regulations;

4. Order Defendants to provide Plaintiffs and the members of the Plaintiff Class:

 a. a free appropriate public education and equal educational access for all students with disabilities and compliance with all special education laws that protect such students; and

 b. appropriate and equal educational services to all students with disabilities who are in administrative segregation for any amount of time or who are subject to disciplinary measures that interfere with educational services for any amount of time;

5. Order the appointment of a monitor with expertise in the provision of special

education services to oversee the implementation of the above-listed systems, processes, and mechanisms, and grant the monitor authority to administer specific programs and activities of Defendants as may be necessary to ensure the provision of educational services to Plaintiffs and members of the Plaintiff Class;

6.    Retain jurisdiction of this case until Defendants have complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future, absent continuing jurisdiction;

7.    Award Plaintiffs' attorneys' fees and costs, as provided by statute and law; and

8.    Any such other relief as the Court finds just and proper.

Dated:  January 11, 2017

AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY FOUNDATION

BY: s/ Rebecca Livengood
Edward L. Barocas
Jeanne LoCicero
Rebecca Livengood
PO Box 32159
Newark, New Jersey  07102
(973) 854-1733

Mary-Lee K. Smith*
Seth Packrone*
DISABILITY RIGHTS ADVOCATES
675 Third Avenue, Suite 2216
New York, NY 10017
(212) 644-8644

Brian L. Friedman*
William C. Silverman*
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
(212) 969-3000

*Motions to appear *Pro Hac Vice* to be filed
*Attorneys for Plaintiffs*

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

The matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding. I certify under penalty of perjury that the foregoing is true and correct.

Dated:  January 11, 2017

AMERICAN CIVIL LIBERTIES
UNION OF NEW JERSEY
FOUNDATION

BY: <u>s/ Rebecca Livengood</u>
     Edward L. Barocas
     Jeanne LoCicero
     Rebecca Livengood
     89 Market Street, 7th floor
     PO Box 32159
     Newark, New Jersey  07102
     (973) 854-1733

     Mary-Lee K. Smith*
     Seth Packrone*
     DISABILITY RIGHTS ADVOCATES
     675 Third Avenue, Suite 2216
     New York, NY 10017
     (212) 644-8644

     Brian L. Friedman*
     William C. Silverman*
     PROSKAUER ROSE LLP
     Eleven Times Square
     New York, NY 10036-8299
     (212) 969-3000

     *Motions to appear *Pro Hac Vice* to be filed

     *Attorneys for Plaintiffs*