**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADAM X., BRIAN Y., CASEY Z., on behalf of themselves and all others situated, and the AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY, and the ARC OF NEW JERSEY,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>NEW JERSEY DEPARTMENT OF CORRECTIONS, VICTORIA KUHN, in her official capacity as Acting Commissioner of the New Jersey Department of Corrections, NEW JERSEY DEPARTMENT OF EDUCATION, and ANGELICA ALLEN-McMILLAN, in her official capacity as Acting Commissioner of the New Jersey Department of Education,<br><br>　　　　Defendants. | Civil Action No. 17-00188 (FLW) (LHG)<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

　　Presently before the Court is an unopposed motion to approve the final Class settlement agreement ("Settlement Agreement")[1] between Adam X., Brian Y., Casey Z., the American Civil Liberties Union of New Jersey ("ACLU-NJ"), and the Arc of New Jersey ("Arc")[2] (collectively,

---

[1] ECF No. 135-3 ("Settlement Agreement and Order").

[2] The ACLU-NJ brings claims both on a diversion of resources injury theory, alleging that they have been forced to expend resources combatting Defendants' illegal special education policies and practices, and on behalf of their members, who are incarcerated young people that allegedly have been denied the special education services that they are entitled to under law.  ECF 26, Amended Complaint at ¶¶ 25-26.  Arc also brings these claims on a diversion of resources theory, asserting that the organization has been forced to expend resources to fight Defendants' allegedly

"Plaintiffs"), and defendants New Jersey Department of Corrections ("DOC"), Victoria Kuhn, in her official capacity as Acting Commissioner of the DOC, the New Jersey Department of Education ("DOE"), and Angelica Allen-McMillan, in her official capacity as Acting Commissioner of the DOE (collectively, "Defendants") (together, "Parties").   Through the Settlement Agreement, DOC and DOE agree to, among other things, modify their policies, practices, and procedures with regards to special education services in New Jersey state prisons, and pay $975,000 in attorneys' fees and costs.[3]   For the following reasons, the Court approves the Settlement Agreement in all respects, including an award to Plaintiffs' Counsel in the amount of $975,000 in attorneys' fees and expenses.

## I.   FACTUAL BACKGROUND

Plaintiffs filed this civil rights class action on January 11, 2017,[4] seeking injunctive and declaratory relief on behalf of prisoners who are disabled students in DOC adult prisons and eligible for special education.   ECF No. 1.   The Complaint alleged that (1) DOC and DOE systematically failed to provide special education, or related services, and equal educational access to students with disabilities, and that as a result, those students were denied a free appropriate public education ("FAPE"), in violation of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* ("IDEA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); and (2) DOC and DOE denied students with disabilities equal access to the educational services and benefits offered and overseen by DOC and DOE in state prisons

---

[3] Plaintiffs also request that each named Plaintiff receive a $5,000 incentive award.  Settl. Mot. at 22 n.9.

illegal actions and inactions, including for advocacy aimed at convincing Defendants to change their special education policies and practices.  Amended Complaint at ¶¶ 27-28.

[4] Plaintiffs filed an Amended Complaint on April 7, 2017.  ECF No. 26.

throughout New Jersey, in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA") and Section 504.  *Id.*

## II.    PROCEDURAL HISTORY

On May 19, 2017, prior to discovery, the Court appointed, with the Parties' consent, a neutral and independent expert, Dr. Joseph Gagnon, to (1) review and evaluate DOC's special education-related policies, practices, and procedures, (2) review and evaluate DOE's policies, practices, and procedures for overseeing of DOC's provision of special education, and (3) recommend best practices and solutions.  ECF Nos. 44, 47.[5]  Dr. Gagnon submitted his report and recommendations to the Parties on March 7, 2018, which the Parties provided to the Court shortly thereafter.  Settl. Mot. at 4.  The Parties then entered into settlement negotiations, including in-person meetings, regular conference calls, and exchanging of numerous written proposals on an approximately monthly basis.  *Id.*  Ultimately, after more than three years of negotiations, including over 30 settlement conferences, the Parties finalized and signed the Settlement Agreement in July 2021.  *See* Settlement Agreement and Order.

On July 16, 2021, Plaintiffs filed an Unopposed Motion for Class Certification and Preliminary Approval.  ECF No. 135.  On July 21, 2021, this Court preliminarily approved the terms and conditions of the Settlement Agreement, approved the method of Notice, set forth the timeline for Class members to object to the Agreement and for Class Counsel to respond to these objections, and scheduled a fairness hearing pursuant to Rule 23(e) for January 26, 2022.  ECF No. 136 ("Preliminary Settlement Approval").  The Court also determined that Plaintiffs' proposed

---

[5] According to Plaintiffs, Dr. Gagnon is an Associate Professor in the Department of Special Education at the University of Florida with a Ph.D. in special education.  Settl. Mot. at 3.  Plaintiffs note that in his role as expert, Dr. Gagnon spent nearly 95 hours on-site at New Jersey state prisons, interviewed over 60 incarcerated students, observed instruction provided to students with disabilities, met with teaching staff, and reviewed over 20,000 related documents.  *Id.* at 4.

Class met the requirements for class certification, and as such, certified that Class pursuant to Rules 23(a) and 23(b)(2).  Preliminary Settlement Approval ¶ 3.  On December 20, 2021, the Court, in a consent order, extended the deadlines for (1) Class members to object to the Settlement Agreement to January 26, 2022, (2) Class Counsel to respond to objections to February 9, 2022, (3) Plaintiffs to file their Motion for Final Approval of Settlement to February 9, 2022, and (4) the Fairness Hearing to March 3, 2022.  ECF No. 144.

By February 9, 2022, Plaintiffs had adequately disseminated Notice to Class members in the manner required by the Preliminary Settlement Approval Order, which the Court had determined would constitute valid, due, and sufficient notice to the Class.  *See* ECF No. 146, Vomacka Decl.  Pursuant to that Order's Notice provisions, and the extended deadlines in the December consent order, between August 2021and January 2022, the DOC posted Notice in law libraries and other necessary spaces, Vomacka Decl. ¶¶ 31-39, and mailed the "Class Notice" and "One-Page Flyer" to the required current and formerly incarcerated Class members identified pursuant to the Order's specifications, Vomacka Decl.  ¶¶ 7-26.  Further, the ACLU-NJ, Disability Rights Advocates ("DRA"), DOC, and DOE all posted the Agreement and links to the Class Notice on their respective organizational website.  ECF 147-2, Borden Decl. ¶¶ 5-6, 10; Vomacka Decl. ¶¶ 40-46.  Notice was adequate and proper.  No objections were ultimately filed.  Settl. Mot. at 12.

## III.    CLASS CERTIFICATION

"In order to approve a class settlement agreement, a district court must determine that the requirements for class certification under Federal Rule of Civil Procedure 23(a) and (b) are met and must determine that the settlement is fair to the class under Federal Rule of Civil Procedure 23(e)."  *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257 (3d Cir. 2009); *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010) ("[a] district court first must determine that

the requirements for class certification under Rule 23(a) and (b) are met.").  The Third Circuit has consistently observed that "Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiffs' and counsel's ability to fairly and adequately protect class interests."  *In re Comm. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) (quoting *In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 799 (3d Cir. 1995) (alterations omitted)).  "The requirements of [Rule 23] (a) and (b) are designed to insure that a proposed class has 'sufficient unity so that absent class members can fairly be bound by decisions of class representatives.'"  *In re Prudential Ins. Co.*, 148 F.3d 283, 309 (3d Cir. 1998) (quoting *Amchem v. Windsor*, 521 U.S. 591, 621 (1997)).  Under Rule 23(a), the prerequisites to class certification are:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class

FED. R. CIV. P. 23(a); *see also Amchem*, 521 U.S. at 613.  "Upon finding each of these prerequisites satisfied, a district court must then determine that the proposed class fits within one of the categories of class actions enumerated in Rule 23(b)."  *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 296 (3d Cir. 2011).

In that connection, Plaintiffs move for class certification under Rule 23(b)(2).  Prelim. Settl. Mot. at 21.  Rule 23(b)(2) states that, "A class action may be maintained if Rule 23(a) is satisfied and if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  FED. R. CIV. P. 23(b)(2).  Rule 23(b)(2) "is almost automatically satisfied in actions primarily seeking injunctive relief."  *Baby Neal for and by Kanter v. Casey*, 43

F.3d 48, 58 (3d Cir. 1994).  In addition, important to the Rule 23(b)(2) analysis "is that the relief

sought . . . should benefit the entire class."  *DB Investments*, 667 F.3d at 317-18 (3d Cir. 2011)

(quoting *Baby Neal*, 43 F.3d at 59).

Notably, "[e]ven if [Plaintiffs have] satisfied the requirements for certification under Rule

23, a class action cannot be settled without the approval of the court and a determination that the

proposed settlement is fair, reasonable and adequate."  *In re Prudential Ins. Co.*, 148 F.3d at 316

(internal quotation marks and citation omitted); *see* FED. R. CIV. P. 23(e)(2) (stating that a district

court may approve a proposed settlement "only after a hearing and on finding that it is fair,

reasonable, and adequate").  In *In re Insurance Brokerage Antitrust Litigation* the Third Circuit

affirmed the applicability of nine factors, as explained more fully below, established in *Girsh v.*

*Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), which are to be considered when determining the

fairness of a proposed settlement.  *See* 579 F.3d at 258.  "In cases of settlement classes, where

district courts are certifying a class and approving a settlement in tandem, they should be 'even

more scrupulous than usual when examining the fairness of the proposed settlement.'"  *In re Nat'l*

*Football League Players Concussion Injury Litig.*, 821 F.3d 410, 436 (3d Cir. 2016) (quoting *In*

*re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004)).  However, "if a fairness

inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a) and (b), and permitting class

designation despite the impossibility of litigation, both class counsel and court would be

disarmed."  *Amchem*, 521 U.S. at 621.   Thus, it is important to "apply[] the

class certification requirements of Rules 23(a) and (b) separately from [the] fairness determination

under Rule 23(e)."  *In re Prudential Ins. Co.*, 148 F.3d at 308.

Finally, as the Supreme Court has observed, when "[c]onfronted with a request

for settlement-only class certification, a district court need not inquire whether the case, if tried,

would present intractable management problems, for the proposal is that there be no trial. But other specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Amchem*, 521 U.S. at 620 (internal citation omitted).

The proposed Class is defined as:

All individuals who are or were housed at any DOC Prison at any point between January 11, 2015 through the Effective Date[6] and who: (1) were identified as being entitled to special education services and reasonable educational accommodations, or (2) were not identified but had a verified Individual Education Plan ("IEP") during or prior to their period of incarceration with DOC, or (3) were not identified but had been diagnosed with an educational disability and for whom IEP development began but did not conclude prior to their period of incarceration with the DOC, or (4) were under age 18 when they entered DOC custody, were born after January 11, 1993, and did not have a high school diploma when they entered DOC custody.

Prelim. Settl. Appr. at 2.  Here, the Court finds that the proposed Class meets the requirements for certification.

### A.  Rule 23(a) Factors

The Court first determines whether Plaintiffs have satisfied the prerequisites for maintaining a class action as set forth in Rule 23(a).

### i.  Numerosity

Rule 23(a)(1) requires a class to be "so numerous that joinder of all members is impracticable[.]"  Although "[t]here is no magic number of class members needed for a suit to proceed as a class action," the Third Circuit has "stated that numerosity is generally satisfied if there are more than 40 class members." *Concussion Injury Litig.*, 821 F.3d at 426.

---

[6] The Settlement Agreement defines the "Effective Date" as "the date of the Court's final approval of this Agreement."  Settlement Agreement and Order § I(e).  As such, the Effective Date is March 3, 2022.

Here, there are well over 40 individuals who meet the Class definition.  Counsel for the Parties represent that there are an estimated 422 putative class members.  ECF No. 135-2, LoCicero Prelim. Decl.  The Class meets the numerosity requirement.

### ii. Commonality

Rule 23(a)(2) requires that there be either questions of law or fact common to the members of the proposed class.  The threshold for establishing commonality is straightforward: "[t]he commonality requirement will be satisfied if the named plaintiffs share at least *one* question of fact or law with the grievances of the prospective class."  *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 596-97 (3d Cir. 2009) (quoting *Baby Neal*, 43 F.3d at 56) (emphasis added). Importantly, the Third Circuit has "acknowledged commonality to be present even when not all members of the plaintiff class suffered an actual injury, when Class Members did not have identical claims, and, most dramatically, when some members' claims were arguably not even viable." *Concussion Injury Litig.*, 821 F.3d at 427 (quoting *In re Cmty. Bank of Northern Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 397 (3d Cir. 2015)).

Here, the Parties have questions of law or fact common to the Class.  These questions concern (1) whether Defendants provided the special education services that Class members were legally entitled to receive, and (2) the DOC's disciplinary policies surrounding administrative segregation or other close custody housing statuses, including whether Class members' disabilities were taken into account in the disciplinary process.  Additionally, there are common answers that will resolve these questions: the Court and the Parties can reach these answers by addressing Defendants' policies and practices, without the need to examine the individual circumstances of any of the Plaintiffs or Class members, as the relief at issue includes the implementation of processes, programs, and generally-applicable policies to ensure that the special education rights

of Class members are protected.  These include new DOC-wide policies to ensure appropriate development and implementation of IEPs, a manifestation determination process, and teacher-led cell-side instruction that does not rely primarily on independent worksheet completion. Finally, all Class members will be able to participate in the new compensatory education program, whereby they may have their educational records reviewed by the External Monitor to determine if they are eligible to receive appropriate compensatory education.

### iii.  Typicality

Rule 23(a)(3) requires the representative parties' claims or defenses to be typical of the claims or defenses of the class.  The Third Circuit has "set a low threshold for typicality." *Concussion Injury Litig.*, 821 F.3d at 428 (internal quotation marks omitted).  In that connection, "[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories' or where the claim arises from the same practice or course of conduct." *Id*.  Thus, typicality only acts as a bar to class certification when "the legal theories of the named representatives potentially conflict with those of the absentees." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 631 (3d Cir. 1996).  "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001).

Here, the named Plaintiffs' claims are typical of the claims of the Class.  Like the Individual named Plaintiffs, each Class member's claims arise from his or her incarceration in DOC prisons and his or her alleged denial of special education services and accommodations during that time, which would violate the IDEA, the ADA, and Section 504.  The two Organizational named

9

Plaintiffs' claims are also typical of the rest of the Class in that they arose from the same conduct by Defendants.

### iv.  Adequacy of Representation

Rule 23(a)(4) requires that the representative parties fairly and adequately protect the interests of the class.  "Rule 23(a)'s adequacy of representation requirement 'serves to uncover conflicts of interest between named parties and the class they seek to represent.'"  *In re Pet Food*, 629 F.3d at 343 (quoting *Amchem*, 521 U.S. at 625).  Class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members."  *Id.* (citation and internal quotation marks omitted).  This requirement has traditionally entailed a two-pronged inquiry: first, the named plaintiffs' interests must be sufficiently aligned with the interests of the absentees; and second the plaintiffs' counsel must be qualified to represent the class.  *In re General Motors*, 55 F.3d at 800.

I find that the parties meet both prongs.  Here, the named Plaintiffs fairly and adequately protect the interests of the Class Members in that (i) named Plaintiffs Adam X., Brian Y., Casey Z., the Arc of New Jersey, and the ACLU of New Jersey do not have interests that are antagonistic to the interests of the Class because all allege harm by Defendants' conduct and all will benefit from the relief requested in this action; and (ii) the proposed Class Counsel, the ACLU of New Jersey Foundation, Disability Rights Advocates, and Proskauer Rose LLP, are all qualified, experienced, and capable of protecting and advancing the interests of the class.

Finally, pursuant to Rule 23(b)(2), Defendants' actions apply generally to the Class, so that final injunctive relief is appropriate to the Class as a whole.  *See* Fed. R. Civ. P. 23(b)(2) ("A class action may be maintained if Rule 23(a) is satisfied and if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole.").  Plaintiffs are seeking injunctive relief based on allegations that Defendants' systemic policies and practices violated the Class's civil rights and deprived its members of access to the education they are owed by law.  The Settlement Agreement will benefit the entire Class by correcting these violations and providing remedial opportunities for those already affected.  As such, the injunctive relief benefits the entire class.

In light of the foregoing, the Class is certified pursuant to Rules 23(a) and 23(b)(2).  I will now proceed to analyze the Settlement terms.

## IV.  TERMS OF SETTLEMENT

Broadly, the Settlement Agreement includes: (1) modifications to DOC's policies, practices, and procedures; (2) monitoring to ensure the modifications are implemented; (3) a compensatory education program for eligible Class members; and (4) several procedural provisions.  *See* Settlement Agreement and Order.  The Parties also agreed to attorneys' fees, costs, and expenses.  *Id*. § XII.

More specifically, among other modifications, DOC is required to assess the educational attainment levels of students entering DOC custody, develop and implement Individualized Education Plans ("IEPs") and Section 504 plans for each eligible student, provide individualized transition services, and provide at least four hours of instruction per day in a regular classroom setting to students with disabilities.  *See Id*. §§ II, IV.  The Agreement also requires DOE to monitor DOC's provision of special education services, with input and oversight from an External Monitor, through site visits, interviews with students and teachers, and reviews of students' educational files.  *Id*. §§ II, IV, VI.  Further, when DOE finds areas of non-compliance, it must develop Corrective Action Plans ("CAPs") for DOC and continue monitoring DOC to ensure the CAPs

were implemented. *Id*. § II, VI. Regarding compensatory education, the Agreement establishes a program for eligible students, both in DOC custody and those released from DOC custody, to obtain compensatory education services provided by DOC, or other approved third-party educational, vocational, or reentry service providers. *Id*. § IV.

## V.  MOTION TO APPROVE SETTLEMENT

At the outset, the Court expresses that the law encourages and favors settlement of civil actions in federal courts, particularly in class actions. *In re Warfarin*, 391 F.3d at 535; *see In re General Motors*, 55 F.3d at 784 ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."). Accordingly, when a settlement is reached on terms agreeable to all parties, it is to be encouraged. *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1314 n.16 (3d Cir. 1993). The Third Circuit applies "an initial presumption of fairness in reviewing a class settlement when: (1) the negotiations occurred at arms [*sic*] length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Concussion Inj. Litig.*, 821 F.3d at 436 (internal quotations omitted). This presumption applies even where, as here, "the settlement negotiations preceded the actual certification of the class[.]" *In re Warfarin*, 391 F.3d at 535.

A class action settlement may not be approved under Rule 23(e) without a determination by this Court that the proposed settlement is "fair, reasonable, and adequate." *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001); *see also* FED. R. CIV. P. 23(e)(2). The Third Circuit has on several occasions stressed the importance of Rule 23(e), noting that "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." *In re General Motors*, 55 F.3d at 785 (citations and quotations omitted); *see also Amchem*, 521 U.S. at 623

(noting that the Rule 23(e) inquiry "protects unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise." (internal quotations and citations omitted)).

The Third Circuit has articulated a set of nine "*Girsh* factors" that courts should consider when determining the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the risks of establishing liability;
> (5) the risks of establishing damages;
> (6) the risks of maintaining the class action through the trial;
> (7) the ability of the defendants to withstand a greater judgment;
> (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and]
> (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh*, 521 F.2d at 157 (internal quotations omitted); *see, e.g.*, *In re Johnson & Johnson Deriv. Litig.*, 900 F. Supp. 2d 467, 479-85 (D.N.J. 2012) (reciting and applying the *Girsh* factors). "The settling parties bear the burden of proving that the *Girsh* factors weigh in favor of approval of the settlement." *In re Pet Food*, 629 F.3d at 350. "A district court's findings under the *Girsh* test are those of fact." *Concussion Injury Litig.*, 821 F.3d at 437.

Since *Girsh*, the Third Circuit has held that, "because of a 'sea-change in the nature of class actions' after *Girsh* was decided thirty-five years ago, it may be helpful to expand the *Girsh* factors to include, when appropriate, the following non-exclusive factors":

> [1] [T]he maturity of the underlying substantive issues ...; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved – or likely to be achieved – for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6]

whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Pet Food*, 629 F.3d at 350 (quoting *In re Prudential Ins. Co.*, 148 F.3d at 323).   "Unlike the *Girsh* factors, each of which the district court must consider before approving a class settlement, the *Prudential* considerations are just that, prudential."   *Concussion Injury Litig.*, 821 F.3d at 437 (internal quotations and citation omitted).   The *Girsh* and *Prudential* factors are well established law and their continued application in the class settlement context has been reaffirmed by Third Circuit.   *See id*.

Here, the Settlement Agreement is "fair, reasonable, and adequate."   *In re Cendant*, 264 F.3d at 231.

### A.  The Presumption of Fairness Applies to this Agreement

The Third Circuit applies "an initial presumption of fairness in reviewing a class settlement when: (1) the negotiations occurred at arms [*sic*] length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."   *Concussion Injury Litig.*, 821 F.3d at 436 (citation omitted).   Here, the Settlement Agreement meets all four factors.

First, the Parties engaged in arm's length negotiations.   Between March 2018 and March 2020, the Parties engaged in over 30 half- or full-day in-person or virtual settlement negotiation sessions under the supervision of Magistrate Judge Goodman at a rate of approximately once per month.   ECF 147-3, Rodgers Decl. ¶¶ 7-8.   In that time, the Parties exchanged dozens of written proposals and responses, which ultimately resulted in the Agreement before the Court.   *Id*.; *see* Settlement Agreement and Order.   Second, although the Parties began the settlement process prior to formal discovery, the Parties produced more than 20,000 pages of documents.   ECF 135-2, LoCicero Prelim. Decl. ¶ 14.   These documents included student records, education materials,

department policies, internal management procedures, operations records, and other related items. *Id*. These documents supported Dr. Gagnon's pre-settlement negotiation analysis, and were reviewed and employed by the Parties as part of negotiations. *Id*. This extensive exchange of documents, which assisted the Parties in reaching this resolution, is sufficient to satisfy the third factor. Third, Class Counsel, who consist of three competent organizations, ACLU-NJ, DRA, and Proskauer Rose LLP, have significant experience as class counsel in civil rights litigation, as well as IDEA, ADA, and prisoners' rights cases. LoCicero Prelim. Decl. ¶¶ 4-5; ECF 135-6, Rodgers Prelim. Decl. ¶¶ 3-6; ECF 135-7, Silverman Decl. ¶¶ 6-10. As this Court noted in certifying the Class, these organizations "are all qualified, experienced, and capable of protecting and advancing the interests of the class." Finally, no members of the Class objected.

Because the Settlement Agreement meets these four factors, prior to applying the *Girsh* factors, the Court presumes the fairness of the Agreement.

### B. The *Girsh* Factors Support Approval of the Settlement Agreement

#### i. Complexity, Expense, and Likely Duration of Litigation

The first *Girsh* factor captures "the probable costs, in both time and money, of continued litigation." *Griffin v. Zager*, No. 16-1234, 2017 WL 3872401, at *6 (D.N.J. Sept. 1, 2017) (quoting *In re Cendant*, 264 F.3d at 233). "By measuring the costs of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably." *Beneli v. BCA Financial Services, Inc.*, 324 F.R.D. 89, 102 (D.N.J. 2018). "Settlement is favored under this factor if litigation is expected to be complex, expensive and time consuming." *In re Royal Dutch/Shell Transp. Sec. Litig.*, No. 04-374, 2008 WL 9447623, at *17 (D.N.J. Dec. 9, 2008).

As noted *supra*, this matter was filed over five years ago, and the Settlement Agreement is the product of three years of arm's length negotiations. If this litigation were to continue, the

potential for protracted litigation might be great.  Both Parties contend that they would have likely prevailed had the matter been fully litigated.  Settl. Mot. at 23.  As such, the Settlement Agreement avoids the time-consuming and costly nature of formal discovery, class certification motion practice, dispositive motion practice, and a potential trial and appeal.  Further, as Plaintiffs note, even if they had successfully proven liability of Defendants, the Parties still would have had to negotiate a complex remedial plan involving multiple state agencies and pertaining to current and formerly incarcerated persons, as they have already done here.  *Id.* at 22-23.  As such, this factor supports approval of the Agreement.

### ii.    Reaction of the Class to the Settlement

As explained *supra*, the Parties posted proper notice of the Settlement Agreement in accordance with the process approved by this Court, and consistent with both Rule 23 and due process.  Vomacka Decl.; Borden Decl.  The Court extended the deadline for Class members to object to January 26, 2022, and ultimately, there were no objections.  Borden Decl. ¶ 30.  The lack of objections is strong evidence of the fairness, reasonableness and adequacy of the settlement. *See In re Cendant Corp., Deriv. Action Litig.*, 232 F. Supp. 2d 327, 333-34 (D.N.J. 2002) ("Given that no formal objection was filed to the settlement itself, there is little doubt that this factor weighs in favor of approval of the Settlement Agreement."); *Bradburn Parent Teacher Store, Inc. v. 3M*, 513 F. Supp. 2d 322, 331 (E.D. Pa. 2007) ("[T]otal absence of objections argues in favor of the proposed settlement") (citations omitted).

### iii.    The Stage of the Proceedings and the Amount of Discovery Completed

The goal of the third *Girsh* factor is to "capture[] the degree of case development that class counsel accomplished prior to settlement.  Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating."  *In re Cendant Corp.*

*Litig.*, 264 F.3d at 235 (3d Cir. 2001) (*citing In re Gen. Motors*, 55 F.3d at 813).  In that connection, "[e]ven settlements reached at a very early stage and prior to formal discovery are appropriate where there is no evidence of collusion and the settlement represents substantial concessions by both parties.  Indeed, courts in this district have approved settlements while the case was in the pre-trial stage and formal discovery had not yet commenced."  *In re Johnson & Johnson*, 900 F. Supp. 2d at 482 (internal citation omitted); s*ee Schuler v. Medicines Co.*, No. 14-1149, 2016 WL 3457218, at *7 (D.N.J. June 24, 2016) (approving settlement prior to discovery because of counsel's investigation).

As noted *supra*, the Parties engaged in over three years of negotiations, with over 30 in-person and virtual settlement conferences, and numerous written proposals and responses. Rodgers Decl. ¶¶ 7-8.  Furthermore, although the Parties did not engage in formal discovery, the Parties exchanged more than 20,000 documents as part of Dr. Gagnon's surveying and reporting process.  LoCicero Prelim. Decl. ¶ 14.  Also, as part of that process, Dr. Gagnon spent nearly 95 hours on-site at New Jersey state prisons with both Parties' counsel, interviewed over 60 incarcerated students, met with teaching staff, and observed classroom instruction for students with disabilities.  LoCicero Prelim. Decl. ¶¶ 15-16.  In light of this significant case development, despite the lack of formal discovery, this factor weighs in favor of approving the Settlement Agreement.

### iv.    Risks of Establishing Liability and Damages

"The fourth and fifth [*Girsh*] factors survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement."  *In re Johnson & Johnson*, 900 F. Supp. 2d at 483 (internal quotations and citation omitted).  "By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate

the claims rather than settle them." *In re General Motors*, 55 F.3d at 814.   In making this assessment, however, "a court should not conduct a mini-trial and must, to a certain extent, give credence to the estimation of the probability of success proffered by [lead] counsel." *Murphy v. Charles Tyrwhitt, Inc.*, No. 20-00056, 2020 WL 8513583, at *10 (W.D. Pa. Nov. 25, 2020) (citations omitted).   In complex cases, "[t]he risks surrounding a trial on the merits are always considerable." *Murphy v. Eyebobs, LLC*, No. 21-00017, 2021 WL 4594679, at *11 (W.D. Pa. Oct. 6, 2021) (quoting *Weiss v. MercedesBenz of N. Am.*, 899 F. Supp. 1297, 1301 (D.N.J. 1995)).

Here, each party maintains that that it would likely have prevailed had the matter been litigated.   Settl. Mot. at 23.   Giving credence to counsels' statements, it is unclear which party would be more likely to establish liability.   *See Murphy*, 2020 WL 8513583, at *10.   Furthermore, examining the complex remedy created by the Settlement Agreement, even if Plaintiffs established liability at a later stage, there is a possibility that the remedy received then might not be as comprehensive as the relief agreed to by the Parties, after three years of extensive negotiations and with the input of subject matter experts.   Additionally, the Settlement Agreement avoids the potential for years of litigation, which would be a detriment to Class members who would otherwise immediately receive the educational benefits afforded by the Agreement.   This factor weighs in favor of supporting approval.

### v.    The Risk of Maintaining the Class Through Trial

The sixth *Girsh* factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial.   A district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable." *In re Warfarin*, 391 F.3d at 537 (citing *In re Prudential Co.*, 148 F.3d at 321).   Because of this, the "specter of

decertification makes settlement an appealing alternative." *O'Brien v. Brain Research Labs, LLC*, No. 12-204, 2012 WL 3242365, at *18 (D.N.J. Aug. 9, 2012).

I agree with Plaintiffs that this factor is neutral because a Class of incarcerated high school students is inherently transitory. Prelim. Settl. Mot. at 18-20. Plaintiffs, therefore, are currently adequate class representatives, and will remain so.

Having weighed all of the *Girsh* factors,[7] the Court finds that the proposed settlement is fair, reasonable, and adequate. As discussed *supra*, although the settlement process has required extensive effort and documentation, the case is still at an early stage. Should the Settlement Agreement be rejected, the matter would still go through formal discovery, motions practice, with the potential for trial and appeals. Should the matter reach trial, there is "no guarantee whom the jury would believe," *In re Cendant*, 264 F.3d at 239, which means that Plaintiffs run the risk of not prevailing on their claims. In addition, there has been adequate notice of the Settlement and no Class member has objected, which strongly supports that the settlement is fair and reasonable. Furthermore, despite the lack of formal discovery, the matter is not in its infancy, as the Parties have produced 20,000 documents in support of Dr. Gagnon's efforts, which were, by themselves, substantial. Finally, the Settlement Agreement will ensure the Class will receive a comprehensive remedy that is the product of three years of arm's length negotiations by all Parties, and eliminates the possibility of a lesser remedy or no remedy should Plaintiffs fail to establish liability later in litigation. For these reasons, and in combination with my finding that this Settlement is entitled to a presumption of fairness, the Court finds the settlement to be fair, adequate, and reasonable.[8]

---

[7] Given that the remedy sought is non-monetary, *Girsh* factors seven through nine are not applicable.

[8] As I determined when granting preliminary approval, and as stipulated to by the Parties, I find that the Settlement Agreement complies with the Prisoner Litigation Reform Act, 18 U.S.C. § 3626(a). Prelim. Settl. Appr. at 5. Specifically, I find that: (i) the education services provided at

## VI.    ATTORNEYS' FEES

The Settlement Agreement provides for an attorneys' fee award of $975,000.  Settlement

Agreement and Order § XII.   "In a certified class action, the court may award reasonable attorney's

fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ.

P. 23(h).  "Attorneys' fees are typically assessed through the percentage-of-recovery method or

through the lodestar method."  *In re AT & T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006).   The

percentage-of-recovery method applies a certain percentage to a settlement fund.  *Id*.  The lodestar

method multiplies the number of hours class counsel worked on a case by a reasonable hourly

billing rate for such services.  *Id*.  A court, when approving a fee award, must first categorize the

action it is adjudicating and then "primarily rely on the corresponding method of awarding

fees."  *In re General Motors*, 55 F.3d at 821 ("The lodestar and the percentage-of-recovery

methods each have distinct attributes suiting them to particular types of cases.  Ordinarily, a court

making or approving a fee award should determine what sort of action the court is adjudicating

and then primarily rely on the corresponding method of awarding fees[.]" (internal citation

omitted)).

A lodestar analysis is fitting where, as is the case here, there is no monetary component to

the settlement and no valuation of the non-monetary award upon which the Court could base a

percentage-of-recovery calculation.  *See In re Schering–Plough/Merck Merger Litigation,* No. 09-

1099, 2010 WL 1257722, *17 (D.N.J. Mar. 26, 2010); *Charles v. Goodyear Tire and Rubber*

---

DOC prisons necessitate the remedial measures contained in the Agreement; (ii) the prospective
relief in the Agreement is narrowly drawn, extends no further than necessary to correct the
violations of federal rights as alleged by Plaintiffs in their Complaint, is the least intrusive means
necessary to correct these violations, and will not have an adverse impact on public safety or the
operation of a criminal justice system; and (iii) the Agreement complies in all respects with 18
U.S.C. § 3626(a).

*Co.,* 976 F. Supp. 321, 325 (D.N.J. 1997) ("As a result of the difficulty in making some reasonable assessment of the settlement's value, this Court will utilize the lodestar method in awarding class counsel's attorneys' fees."); *Osher v. SCA Realty I, Inc.,* 945 F. Supp. 298, 306-07 (D.D.C. 1996) (applying lodestar in shareholder derivative settlement involving only injunctive relief). In that connection, courts generally apply the lodestar method in cases where the settlement "evades the precise evaluation needed for the percentage of recovery method." *In re Gen. Motors,* 55 F.3d at 821. Specific to the matter at hand, in "statutory fee shifting cases . . . [c]ourts generally regard the lodestar method . . . as the appropriate method." *Id.*

Here, the Court will rely on the lodestar method. *See Damian J. v. School Dist. of Philadelphia*, 358 Fed. App'x 333, 335-37 (3d Cir. 2009) (applying lodestar method to determine reasonableness of attorneys' fees in case brought under the IDEA and Section 504). This matter was brought pursuant to the ADA, Section 504, and IDEA, which each contain fee-shifting provisions that authorize a prevailing plaintiff to recover reasonable attorneys' fees and costs. 42 U.S.C. § 12205 (ADA); 29 U.S.C. § 794a(b) (Section 504); 20 U.S.C. § 1415(i)(3) (IDEA). Further, according to the Settlement Agreement, Plaintiffs are prevailing parties, and Defendants agree to pay Plaintiffs' Counsel $975,000 in attorneys' fees and expenses. Settlement Agreement and Order § XII. The Settlement Agreement also does not provide for a common fund. *See* Settlement Agreement and Order. As such, the Lodestar method applies.

**A. Lodestar**

Under the lodestar analysis, counsel fees are determined by multiplying the number of hours reasonably spent litigating the matter by counsel's hourly rate. This yields the "presumptively reasonable fee." *Hahnemann Univ. Hosp. v. All Shore, Inc.,* 514 F.3d 300, 310

(3d Cir. 2008) (citation omitted); *Washington v. Philadelphia County Court of Common Pleas,* 89 F.3d 1031, 1035 (3d Cir. 1996) ("The lodestar is strongly presumed to yield a reasonable fee.").

"Courts must thoroughly analyze an application for attorneys' fees in a class action settlement." *O'Brien,* 2012 WL 3242365, at *20 (quoting *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 299 (3d Cir. 2005)). It is of no moment that the parties have consented to the proposed attorney's fees. *See Yong Soon Oh v. AT & T Corp.,* 225 F.R.D. 142, 146 (D.N.J. 2004). Because there is a risk that "lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees," *In re Gen. Motors*, 55 F.3d at 820 (citation and quotation marks omitted), courts must be vigilant in ensuring that the fees are reasonable.

> The first step in applying the lodestar formula is to determine the appropriate hourly rate. In determining the appropriate hourly rate, the court should first consider the attorney's usual billing rate. The Supreme Court has indicated that the district court can also consider the prevailing market rates in the relevant community to assist in the determination of an appropriate hourly rate. In calculating the second part of the lodestar formula, the time reasonably expended, the district court should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary. Time expended is considered reasonable if the work performed was useful and of a type ordinarily necessary to secure the final result obtained from the litigation.

*Schering-Plough,* 2010 WL 1257722, at *17 (internal quotation marks and citations omitted).

In other words, the lodestar formula is a two-part process: first, the Court must determine the appropriate hourly rate for each counsel and, second, the Court must determine the reasonableness of the time expended, reducing the number of hours claimed where appropriate. Once the lodestar amount is determined, the court may decrease or increase that amount by applying a multiplier, *i.e.,* "a device that attempts to account for the contingent nature or risk

involved in a particular case and the quality of the attorneys' work." *In re Diet Drugs,* 582 F.3d

524, 540 n.33 (3d Cir. 2009) (citation omitted).

Class Counsel's billing rates are as follows:

| Attorney (Law Graduation Year) | Title (Organization) | Billing Rate |
|---|---|---|
| Mary-Lee Kimber Smith (2005) | Co-Director of Litigation (DRA) | $675 |
| Maia Goodell (2001) | Senior Staff Attorney (DRA) | $730 |
| Michelle Caiola (1994) | Managing Director (DRA) | $815 |
| Seth Packrone (2015) | Staff Attorney (DRA) | $425 |
| Andrea Kozak-Oxnard (2017) | Staff Attorney (DRA) | $365 |
| Jeanne LoCicero (2000) | Legal Director (ACLU-NJ) | $755 |
| Tess Borden (2014) | Staff Attorney (ACLU-NJ) | $435 |
| Rebecca Livengood (2013) | Skadden Fellow (ACLU-NJ) | $455 |
| Elyla Huertas (2017) | Staff Attorney (ACLU-NJ) | $365 |
| Brian Friedman (1999) | Senior Counsel (Proskauer Rose LLP) | $875-$975 |
| Lee Douthitt (2012) | Associate (Proskauer Rose LLP) | $815-$850 |
| Russell Gorkin (2012) | Associate (Proskauer Rose LLP) | $950-$995 |
| Courtney Bowman (2013) | Associate (Proskauer Rose LLP) | $695-$895 |
| Helena Zheng (2014) | Associate (Proskauer Rose LLP) | $610-$650 |
| Annabel Pollioni (2017) | Associate (Proskauer Rose LLP) | $445-$515 |
| Anum Chaudhry (2017) | Associate (Proskauer Rose LLP) | $545 |

Rodgers Decl. ¶¶ 24-63. In total, Class Counsel billed 4,295 hours, which they contend yields a

collective lodestar of $1,730,435.50.[9] Rodgers Decl. ¶ 19; ECF No. 148, Borden Supp. Decl. ¶¶

11-19. In addition, Class Counsel maintains they would have been justified in seeking full

recovery of their $50,526.60 in costs. Rodgers Decl. ¶ 68. Despite this, Class Counsel's total fee

and expense request is $975,000. Settlement Agreement and Order § XII. This total represents a

negative lodestar multiplier of 0.56. Borden Supp. Decl. ¶ 19.

I find that the billing rates and fee amount are reasonable. As to billing rates, after

examining the amounts charged by the relevant firms, and considering the rates typically charged

by firms in the relevant geographic area, I find that Class Counsel's billing rates were reasonable.

---

[9] Plaintiffs note that Proskauer Rose LLP, in particular, reduced its settlement demand to $295,621 in attorneys' fees, which results in a blended rate of approximately $285 per hour for 1035.6 hours of work. Rodgers Decl. ¶ 54.

Regarding the fee amount, this is a protracted, hard-fought litigation that was filed over five years ago.  The Court was part of the settlement negotiations, and thus has first-hand knowledge of the process undertaken by the Parties.  I have reviewed the billing entries, and they appear to be consistent with the efforts and hours claimed to be expended by Class Counsel.  Furthermore, Counsel has voluntarily applied a sizable negative lodestar multiplier, which has resulted in a significantly reduced fee amount.   In addition, there were no objections to the Settlement Agreement or attorneys' fees.  As such, the Court is satisfied that the requested billing rates and fee amount are reasonable.

Further, I find that the requested multiplier is reasonable.  First, as explained *supra*, the Third Circuit has stated that the lodestar yields a "presumptively reasonable fee."  *Hahnemann*, 514 F.3d at 310; *see Philadelphia County*, 89 F.3d at 1035.  Second, examining the percentage-of-recovery-factors that have not been discussed in other portions of this Opinion,[10] which I may use to cross-check to the reasonableness of a fee award, the fee award is clearly reasonable.  *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d at 300 (noting that the Third Circuit has "suggested it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation.").  As to the first factor, more than 400 identified current and former incarcerated persons will receive significant educational, vocational, or reentry benefits.  Settl. Mot. at 36.  Regarding factors three

---

[10] "(1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement[.]"  *In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009) (internal citations omitted).

and eight, Class Counsel acted skillfully in investigating the systemic violations at issue, and Class Counsel was solely responsible for initiating litigation.  Further, Class Counsel have significant experience in class actions, disability rights, special education, and prisoners' rights litigation.  *See* LoCicero Prelim. Decl.; Rodgers Prelim. Decl.; Silverman Decl. As to the ninth factor, the Agreement contains many innovative terms.  The Settlement Agreement not only mandates considerable changes in the policies and practices of DOC that will result in benefits to those currently incarcerated, but various forms of remedial education to those who are no longer incarcerated but were deprived of a legally entitled education.  As such, these factors weigh in favor of approval of the agreed-upon fee amount.

Finally, Plaintiffs request that the Court approve an incentive award of $5,000 for each named Plaintiff.  Settl. Mot. at 22 n.9. Courts "may grant incentive awards in class action cases to particular members of the class . . . to reward the public service performed by lead plaintiffs[.]" *In re Cendant*, 232 F. Supp. 2d at 344.  Considering Plaintiffs' willingness to dedicate their time and efforts to this important matter, ECF Nos. 135-8, 135-9, 135-10, I approve the requested incentive award payments to each of Plaintiffs Adam X., Brian Y., and Casey Z.

## VII.    CONCLUSION

For the foregoing reasons, the Court finds that the Settlement Agreement, including the attorneys' fee and cost request of $975,000 and incentive award payments of $5,000 to each named Plaintiff, is approved in all respects.


Date: March 3, 2022                                      /s/ Freda L. Wolfson
                                                         Hon. Freda L. Wolfson
                                                         U.S. Chief District Judge